Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAMIEN PUJO, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EHANG HOLDINGS LIMITED, HUAZHI HU, CONOR CHIA-HUNG YANG, and RICHARD JIAN LIU,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Plaintiff Damien Pujo ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding EHang Holdings Limited ("EHang" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded EHang securities between January 20, 2022 and November 6, 2023, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased EHang securities during the Class Period and was economically damaged thereby.

7.      On its website, EHang describes itself as an "autonomous aerial vehicle technology company."

8.      The Company is incorporated in the Cayman Islands and operates through subsidiaries in China. The Company's principal executive offices are located at 11/F Building One, EHang Technology Park, No. 29 Bishan Blvd., Huangpu District, Guangzhou, Guangdong Province, 510700, People's Republic of China.

9.       EHang's American Depositary Shares ("ADS" or "ADSs") trade on the NASDAQ exchange under the ticker symbol "EH".

10.     Defendant Huazhi Hu ("Hu") is the founder of the Company. He has served as EHang's Chief Executive Officer ("CEO") and as the Chairman of the Board of Directors (the "Board") Director since the Company's founding in 2014.

11.     Defendant Conor Chia-hung Yang ("Yang") has served as a Company director since December 2019 and as the Company's Chief Financial Officer ("CFO") since September 2023.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

12. Richard Jian Liu ("Liu") served as the Company's CFO from May 2017 through September 2023.

13. Defendants Hu, Yang, and Liu are collectively referred to herein as the "Individual Defendants."

14. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

15. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to EHang under *respondeat superior* and agency principles.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

17.     Defendant EHang and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

18.     On January 20, 2022, EHang published a press release on its website which said "EHang Receives Pre-order for 50 Units of EH216 in Japan" (the "AirX Announcement"). The AirX Announcement stated that "[AirX], *a leading Japanese air mobility digital platform company*, has placed a pre-order for 50 units of the EH216 AAV, marking the biggest pre-order EHang has received in Japan." (Emphasis added). Further, the AirX announcement stated "[t]he pre-order of the EH216 AAVs are planned to facilitate various Urban Air Mobility ('UAM') projects in Japan *and may provide 'air taxi' services for the 2025 World Expo* in [Osaka, Japan]." (Emphasis added).

19.     Given the pricing of the EH216, the deal equated to a value of $15 million.

20.     The statement in ¶ 18 was materially false and misleading because it omitted that AirX is an early stage startup that has raised less than $1 million, calling into question whether AirX will be able to afford the EHang aircraft. Further, given Japan's air safety regulations, it is unlikely that AirX (or any other Japanese entity) will be able to operate the EH216 in 2024, due to Japan's certification requirements.

21.     On April 11, 2022, EHang posted a press release on its website entitled "EHang Receives Pre-Order for 100 United of EH216 AAVs from Indonesian Company Prestige Aviation." (the "Prestige Announcement"). The Prestige Announcement stated, in pertinent part:

EHang [. . .] has received a pre-order for 100 units of EH216 AAVs from *Prestige Aviation, an Indonesian aviation company* [. . .]. It is the largest

4

pre-order EHang has received so far for its passenger-grade AAVs in Asia. Prestige Aviation previously purchased one unit of EH216 from EHang, and the two parties jointly conducted a debut flight demonstration for aerial sightseeing in Bali, Indonesia in 2021.

*       *       *

Rudy Salim, Executive Chairman of Prestige Aviation, said "EHang has long been a crucial partner to Prestige Aviation. *As a forerunner of Indonesia's sustainable transportation, we hope that we can address the Indonesian public's need for aerial transportation and therefore, we are ready to support the Indonesian new capital Nusantara's Smart City initiative with EH216 AAVs*. Indonesia is an archipelagic country with more than 17,000 islands within its borders. Therefore, a new transportation mode that can facilitate inter-island mobility will undoubtedly help regional economies to grow exponentially, assisted by its low cost when compared to other conventional land routes. *We will join hands with EHang to bring safe, efficient, economical and eco-friendly transport solutions to facilitate inter-island mobility and many other scenarios in Indonesia*."

(Emphasis added).

22.     The Prestige Announcement described Prestige Aviation ("Prestige") as a "*company that specializes in the aviation industry and operates under the supervision of its parent company, Prestige Corp. Prestige Aviation provides aviation services that includes the sale and acquisition of aerial vehicles and private jet lease*." (Emphasis added).

23.     The statements in ¶¶ 21-22 were materially false and misleading because Prestige did not conduct meaningful business in the aviation sector at the time the statement was made, and does not presently conduct meaningful business in the aviation sector.

24.     Then, on April 27, 2023, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2022 ("SOX") signed by Defendants Hu and Liu

5

attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

25.     Regarding AirX, the 2022 Annual Report stated "[i]n Japan, we cooperated with AirX Inc., *a leading air mobility digital platform company* [. . .] and also secured a pre-order for 50 units of the EH216 series from [AirX]." (Emphasis added)

26.     The statement in ¶ 25 was materially false and misleading because, as an early stage company with less than $1 million in funding. Accordingly, AirX is unlikely to be able to pay for an order worth $15 million.

27.     Regarding Prestige Aviation, the 2022 Annual Report stated "[i]n Indonesia, we partnered with Prestige Aviation, *an Indonesian aviation company* and received a pre-order for 100 units of the EH216-S." (Emphasis added).

28.     The statement in ¶ 27 was materially false and misleading because Prestige does not appear to have discernible operations (not counting promotional activities) in the aviation sector, or the means to pay for 100 units of the EH216-S.

29.     The 2022 Annual Report contained the following statement regarding United Therapeutics:

> We entered into a 15-year development and conditional purchase agreement in 2016 with Lung Biotechnology PBC, a wholly-owned subsidiary of a U.S. biotechnology company United Therapeutics Corporation (Nasdaq: UTHR), with the aim to enable routine fully-autonomous organ delivery missions from its facilities to hospitals for transplant. The customer intended to purchase 1,000 units of customized AAVs upon achievement of specified performance milestones and that the customer obtains required approvals from the FAA and the FDA for their commercial operation of our AAVs. As of December 31, 2022, we had delivered five units of passenger-carrying AAVs to this customer for their trial operations conducted in Canada.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

30.     The statement in ¶ 29 was materially false and misleading because the Company's partnership with United Therapeutics is, in the words of a former EHang employee, "dead". Upon information and belief, the planned partnership with United Therapeutics was "dead" by the time the 2022 Annual Report was filed.

31.     In the 2022 Annual Report, Defendants stated "***[a]s of December 31, 2022, we had unfilled pre-orders for  more than 1,200 units of the EH216 series and the VT-30 AAVs***." (Emphasis added). Further, Defendants stated "[a]s of March 31, 2023 [. . .] the pre-orders we received for the EH216 series and the VT-30 had more than 1,200 units in overseas markets on a cumulative basis."

32.     Regarding customer obligations, Defendants stated that "[p]re-orders do not obligate the customers to purchase our AAVs unless certain conditions are satisfied. ***Fulfilment is expected to take several years and is conditional upon, among other things, achievement of performance milestones and receipt of regulatory approvals***." (Emphasis added).

33.     The statements in ¶ 31-32 were materially false and misleading because EHang was unlikely to be able to fill orders for 1,200 units of its aircraft, given that United Therapeutics reportedly abandoned its partnership with EHang, and because other entities that had placed pre-orders, such as Prestige, are not in a financial position to pay in full for their orders.

34.     Further, in ¶ 32 Defendants materially understated the precarious nature of fulfilling the 1,200 preorders, considering that partners had abandoned business plans with EHang, or otherwise do not appear able to pay for their orders.

35.     In the 2022 Annual Report, the Company stated the following regarding its customer base:

***Strong customer base and wide partnership network across the value chain to enable UAM ecosystem and commercial operations***

7

With the first type of passenger-carrying AAVs available in the market ahead of other eVTOL aircraft, *we have accumulated a strong customer base and wide partnership network with key stakeholders worldwide including regulators, public sectors, aviation companies, tourism companies, real estate companies, vertiport designers and constructers, telecommunication providers, Maintenance, Repair and Overhaul ("MRO") service providers, industry associations, etc*. We have also participated in a number of European Union's UAM demonstration projects. Our joint efforts and collaborations across the value chain will empower the UAM ecosystem for commercial operations and sustainable development.

(Emphasis added).

36.     The statement in ¶ 35 was materially false and misleading because the Company falsely included in its customer base entities that had abandoned their partnerships or were otherwise unlikely to be able to pay for their ordered EHang aircraft.

37.     On September 29, 2023, EHang posted an announcement on its website entitled "EHang Delivers 5 Units of EH216-S AAVs to Boling in Shenzhen." (the "Boling Announcement").

38.     In the Boling Announcement, EHang announced that it had delivered five units of EH216-S to a new customer, Shenzhen Boling Holding Group Co., Ltd. ("Boling"), as part of Boling's reputed plan to purchase up to 100 units of EH216-S from EHang, conditioned on Boling receiving certain certifications from the Civil Aviation Administration of China ("CAAC"), and other agreements.

39.     In the Boling Announcement, EHang stated that "*Boling aims to be a long-term AAV operator in Shenzhen through collaboration with EHang*, and deploy the EH216-S AAVs purchased for activities such as aerial sightseeing and experience flights, further expanding the UAM strategic layout in Shenzhen." (Emphasis added).

40.     The Boling Announcement, posted on EHang's website, contained a description of Boling as "a *comprehensive integrated company that combines*

8

*various businesses*, including the cultural and tourism, international education, research and development of smart city technologies, cultural and technology, exhibition services, international trade, hotel management and operation, as well as cross-border e-commerce." (Emphasis added).

41.    The statements in ¶¶ 39-40 were materially false and misleading because Boling does not appear to be a going business concern.

42.    On October 13, 2023, EHang posted online a presentation dated "October 2023" entitled "EHang – Enabling Safe, Autonomous, Eco-friendly air mobility." (the "October 2023 Presentation").

43.    The October 2023 Presentation contained, as seen below, a slide saying that it had 1,200+ units of EH216 and VT-30 pre-orders overseas:



44.    This slide was materially false and misleading because the pre-order units included pre-orders that had been abandoned, or where the ordering entity was unlikely to be able to afford the order.

45.    The October 2023 Presentation also contained the following slide on the Company's purported partners, which included United Therapeutics, DHL, and Vodafone, among others:

9



46.     This image was materially false and misleading because it included United Therapeutics, Vodafone, and DHL. These are entities who, upon information and belief, were not conducting business with EHang at the time EHang published the October 2023 Presentation.

47.     The statements contained in ¶¶ 18, 21, 22, 24, 25, 27, 29, 31, 32, 35, 37, 38, 39, 40, 42, 43, and 45 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) EHang has continued to state that it was partnering with United Therapeutics, DHL and Vodafone, among others, even though a former EHang employee has noted that United Therapeutics, DHL, and Vodafone have abandoned their respective deals with EHang; (2) EHang omitted that other entities that had placed pre-orders for its aircraft, such as Prestige Aviation and Shenzhen Boling Holding Group, did not engage in regular business

in the aviation sector and are otherwise almost certainly not in a financial position to be able to afford their orders; and (3) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

48.     On November 7, 2023, before the market opened, *Hindenburg Research* ("Hindenburg") released a report entitled "Ehang: Hollow Order Book And Fake Sales Make This China-Based eVTOL Company Last in Line For Takeoff" (the "Hindenburg Report").

49.     The Hindenburg Report made a number of allegations regarding the Company's business, operations, and prospects. The Hindenburg Report raised issues with EHang's purported deals with entities called United Therapeutics, Prestige Aviation, AirX, Shenzhen Boling Holdings Group, and DHL Sinotrans ("DHL" or "DHL Sinotrans").

50.     The Hindenburg Report preliminarily stated that "EHang's 1,300+ unit preorder book suggests solid demand and serves as the most critical metric for quantifying future revenue potential." However, "[a]fter examining every preorder and partnership [.], *our research indicates that over 92% of EHang's preorder book is based on deals that were later 'abandoned' or came from customers in no financial position to purchase EHang's aircraft in volume, or at all*." (Emphasis added).

51.     Regarding United Therapeutics, the Hindenburg Report quoted a former EHang employee as stating that the deal with United Therapeutics was "*dead*". (Emphasis added).

52.     The same employee told Hindenburg that EHang's partnerships with Vodafone and DHL had failed, and that EHang does not remove former partners

11

from its investor materials after the conclusion of a respective partnership, as to do so would be an admission of failure.

53.    The Hindenburg Report specifically quoted the former employee as saying "***EHang partnered with Vodafone for communications, [Heli-East for helicopter operations], [and DHL] for doing logistical drones, but [. . .] [this is the same as the United deal]. It's dead—it's a dead end***." (Emphasis added).

54.    The Hindenburg Report further quoted the former employee as saying the following:

> EHang, they enter the Ambular project… for them, it's a catchy idea, you know, to transport organs and liver, [or] heart, whatever, and say we're going to save lives. For them it was an ice breaker or promotion, marketing. ***Then these things failed, they lose their part, and what they don't do in China is take out from the videos or the article[s] in their web[site] because they think that taking it out is like admitting it failed***.

(Emphasis added).

55.    Hindenburg directly contacted United Therapeutics to see if it could confirm whether it had an existing partnership with EHang or not. Hindenburg stated that "[t]ypically, companies with active, thriving partnerships are happy to confirm as such. ***We put in multiple calls and emails to United's investor relations department and the head of its drone program to inquire about the status of its partnership with EHang, but heard nothing***." (Emphasis added). After a week of attempting to communicate with United Therapeutics regarding its dealings with EHang, Hindenburg stated that it received a response from Elliot Sloane, United Therapeutics' PR spokesman.

56.    United Therapeutics did not confirm an existing partnership, and the Hindenburg Report quoted Elliot Sloane, as saying "[y]ou've called 20 people, and it's like, obsessive, and it's too much…***You know, we have no comment. We're***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

***just not going to comment on this. So, I hope you can take that for an answer***." (Emphasis added).

57.     The Hindenburg Report also discussed the purported 100-unit preorder, worth an estimated $30 million (based on the unit price of the applicable EHang aircraft), from Prestige, which EHang had characterized as an "Indonesian Aviation Company".

58.     Hindenburg noted that Prestige is owned by Rudy Salim ("Salim"), a social media influencer, and stated that "***[o]ne would expect that a $30 million preorder might come from an established aviation company with aircraft, pilots, or any observable aviation-related operations. On the contrary, we couldn't even find a website for Prestige Aviation, much less an active aviation-related business***." (Emphasis added). Further, the Hindenburg Report stated "[t]he company shows just 2 employees on LinkedIn."

59.     The Hindenburg Report also noted that "Salim, ***who has no discernible aviation experience, spends much of his time producing self-promotional social media content***." This includes short films where Salim can be seen "***racing supercars and engaging in gun fights with animated villains***." (Emphasis added).

60.     To illustrate, the below image is from one of Salim's social media posts:



(Prestige Aviation CEO Rudy Salim cosplaying an action superhero. Source: Rudy Salim Instagram

13

61.     The Hindenburg Report further stated that, outside of promotional events with EHang, the only evidence Hindenburg "could find that Prestige had an aviation business *were several early photos of Prestige Aviation's planes on social media, but they appear to be photoshopped*." (Emphasis added).

62.     Hindenburg highlighted that one photo posted on Instagram (by an unknown person who may have been affiliated with Prestige) of a Prestige-branded jet appeared to be identical to a jet (except that it did not have the Prestige logo) featured in another Instagram post by the same user, in the same week as the post with the plane with the Prestige logo, leading Hindenburg to believe the Prestige logo was photoshopped onto the plane. Below is the photo of the aircraft with the logo that Hindenburg claimed was photoshopped onto the plane:



(Source: Instagram
(https://www.instagram.com/p/CJtKGWlpQ4l/))

63.     Below is a screenshot from the second post by the same user, which appears to have the same jet, but without the Prestige logo:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS



(Source: Instagram
(https://www.instagram.com/stories/highlights/17877085135751953/))

64.    Hindenburg also highlighted that, three months after the photo with the photoshopped logo had been posted on Instagram, Salim incorporated Prestige with just ***$34,000 in registered capital*** the day before Salim announced a partnership with EHang on his Instagram account. (Emphasis added). Further, Hindenburg noted that Prestige was incorporated with an address that matched a car dealership owned by Salim.

65.    Regarding AirX, the Hindenburg Report stated that "[w]hile EHang described AirX as a 'leading Japanese air mobility digital platform company,' ***we found no indication that AirX has any physical aviation assets of its own***." (Emphasis added). The Hindenburg Report further stated that "AirX's website shows that it is a 20-employee company ***based out of a WeWork office. It has raised U.S. ~$900,000 total since inception, according to Crunchbase***. AirX's website advertises "Capital" of 149 million yen, or approximately $993K USD." (Emphasis added and internal citations omitted).

66.    In addition, the Hindenburg Report stated that AirX's "'offering' consists of trying to resell EHang's products, according to its website. The website states that orders will be fulfilled by importing from EHang, indicating that AirX hopes to act as a middleman for 50 EHang units that don't yet seem to have actual buyers." (internal citation omitted). In sum, the Hindenburg Report stated that "***[a]s opposed to an aviation company capable of purchasing $15 million worth of eVTOL's, AirX appears to be a startup focused on scaling its digital marketplace***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*for booking helicopter sightseeing tours with third-party operators*." (Emphasis added).

67.     The Hindenburg Report also called into question whether AirX will be able to fly the EHang EH216 aircraft by 2024. It stated "AirX claims the EH216 will be ready for commercial flight in Japan by 2024, ***which we see as impossible given that EHang must apply for a Type Certification in Japan***." (Emphasis added). The certification process, Hindenburg noted, reportedly takes "years".

68.     Regarding Boling, the Hindenburg Report called into question whether Boling conducts any business activities at all. The Hindenburg Report first noted that in the Boling Announcement, "EHang announced it had delivered 5 units to a new customer, [Boling], which plans to purchase up to 100 units for aerial sightseeing applications." Further, "[a]ccording to the [Boling Announcement], Boling is a diverse conglomerate with businesses across 8 different sectors."

69.     However, Hindenburg stated that "[d]espite its claimed broad operations, ***Boling has no staff or registered insured employees*** according to QCC, a Chinese business data aggregator." (Emphasis added). Hindenburg further noted that "[o]n September 24, 2023, ***just five days*** before EHang issued its press release announcing that the units would be delivered, ***the entity changed the scope of its business, adding various aviation segments, as well as tourism***, according to QCC." (Emphasis added).

70.     Hindenburg further noted that, in the Boling Announcement, Xu Guanshen ("Xu") was listed as Boling's chairman, and "has minimal presence online." Internet searches for Xu resulted in very few results, "none of which suggested any business operations for the company."

71.     Finally, Hindenburg visited Boling's registered business address in China, and found no evidence of business activity. In sum, Hindenburg stated "[w]e were ***unable to confirm any business operations for Boling, much less an active***

16

*aviation business with the capital and experience to acquire and operate 100+ autonomous aircraft from EHang*." (Emphasis added).

72.    Regarding DHL-Sinotrans ("DHL"), Hindenburg first noted that "in 2019, EHang announced a strategic partnership with shipping giant DHL to develop an urban drone delivery business [in] China." (the "DHL Announcement") After the DHL Announcement, Hindenburg said that the "only update [it could find] was in an August 2020 earnings call, where [DHL] said that EHang was 'in good cooperation with them [DHL]', but that it was still 'early stage'".

73.    Hindenburg quoted a former EHang employee about the status of the deal with DHL, who said "[s]o, you don't hear any more about the DHL-Sinotrans company in China working with EHang. *Why? Because there were some problems in the integration and then they abandoned the project*, but they don't claim, nobody says 'we closed the project'…*they never admit any failure or any dead ends*." (Emphasis added).

74.    On this news, the price of EHang ADSs declined by $1.90 per ADS, or 12.70%, to close at $13.06 on November 7, 2023.

75.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

76.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

77.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

78.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

•       whether the Exchange Act was violated by Defendants' acts as alleged herein;

•       whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

•       whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

82. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

19

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

83. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

84. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

85. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

89.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

90.     Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

91.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

92.   Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

93.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

94.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## <u>COUNT II</u>

### <u>Violations of Section 20(a) of the Exchange Act</u>

### <u>Against the Individual Defendants</u>

95.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because

of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

97.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

98.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

99.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: 12/4/2023                          **THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS