Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi (*Pro Hac Vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

*Lead Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ZHAN KUI ZHANG, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EHANG HOLDINGS LIMITED, HUAZHI HU, CONOR CHIA-HUNG YANG, RICHARD JIAN LIU, and XIN FANG,<br><br>Defendants. | Case No. 2:23-cv-10165-FLA (DFMx)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Court-appointed Lead Plaintiff Zhan Kui Zhang ("Plaintiff"), individually and on behalf of all other similarly situated persons and entities, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation undertaken by his counsel, which included review and analysis of: (i) regulatory filings made by EHang Holdings Limited ("EHang" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) press releases, transcripts of earnings calls, and other public statements issued by and disseminated by the Company; (v) other publicly available material and data; and (vi) interviews with former EHang employees. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a putative securities class action on behalf of a Class (as defined herein) of all persons and entities who purchased or otherwise acquired the publicly-traded American Depositary Shares ("ADSs") of EHang between March 29, 2022 and November 6, 2023, both dates inclusive (the "Class Period"), and who were damaged thereby.[1] Plaintiff seeks to recover compensable damages

[1] Excluded from the Class are all Defendants, the present and former officers and directors of EHang and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any such excluded persons have or had a controlling interest. Also excluded from the Class are persons or entities who suffered no compensable damages under the securities laws during the Class Period.

caused by Defendants' violations of Sections 10(b) and 20(a) of Securities Exchange Act of 1934 (the "Exchange Act").

2. Headquartered in Guangzhou, China, EHang makes automated aerial vehicles, or AAVs, but its model's limited range and flight time drastically limit its potential market. So EHang sold itself to investors on the strength of its 1,300+ unit pre-order book.

3. With EHang's backlog of pre-orders ostensibly covering several years' worth of production, EHang drastically reduced its risk profile for investors – because they did not have to worry about the demand (or lack thereof) for EHang's AAVs.

4. EHang's 1,300+ book of pre-orders, however, was a Potemkin village. The two largest pre-orders in EHang's backlog were a 1,000-unit order from a U.S. biotechnology company, United Therapeutics Corporation, and an order for 100 AAVs from an Indonesian company, Prestige Aviation. Neither was what EHang claimed.

5. By the start of the Class Period, the United Therapeutics' pre-order had already been cancelled. While EHang had signed an agreement in 2016 to develop an AAV that could service United Therapeutics' proposed business plan of organ delivery, United had also contemporaneously entered into similar agreements with two other AAV companies. EHang had lost the competition with the other companies. EHang's AAVs did not have sufficient range to serve United's needs. By 2022, EHang and United had terminated the agreement.

6. The Prestige Aviation pre-order was wildly inflated. In actuality, Prestige Aviation's pre-order was for approximately 12 AAVs, not 100.

7. EHang's façade came tumbling down when, on November 7, 2023 before market open, the investment research firm Hindenburg Research LLC published a report revealing that the United Therapeutics pre-order had long been

terminated, and that Prestige Aviation could not possibly have pre-ordered 100 AAVs.

8. Hindenburg's disclosure of EHang's fraud shocked the market, and the price of EHang ADSs declined by 12.7%, or $1.90 per ADS, to close at $13.06 on the same day, damaging Plaintiff and other unsuspecting EHang investors.

## II. JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

12. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

13. Lead Plaintiff Zhan Kui Zhang purchased EHang ADSs during the Class Period as set forth in his PSLRA Certification on file with the Court (ECF No. 16-2), and has suffered damages as a result of the violations of the federal securities laws alleged herein.

14. Defendant EHang describes itself as an "autonomous aerial vehicle technology company." EHang is incorporated in the Cayman Islands and operates through subsidiaries in China. EHang's principal executive offices are located at 11/F Building One, EHang Technology Park, No. 29 Bishan Blvd., Huangpu District, Guangzhou, Guangdong Province, 510700, People's Republic of China ("China" or the "PRC"). EHang's ADSs trade on the NASDAQ exchange under the ticker symbol "EH".

15. Defendant Huazhi Hu ("Hu") is the founder of EHang. He has served as EHang's Chief Executive Officer ("CEO") and as the Chairman of the Board of Directors (the "Board") Director since the Company's founding in 2014.

16. Defendant Conor Chia-Hung Yang ("Yang") has served as a director of EHang since December 2019 and as the Company's Chief Financial Officer ("CFO") since September 2023.

17. Defendant Richard Jian Liu ("Liu") served as the Company's CFO from May 2017 through September 2023.

18. Defendant Xin Fang ("Fang") served as Company's Chief Operating Officer ("COO") from February 2022 until his resignation in June 2024. EHang's press release announcing Fang's appointment as COO stated that Fang was "in charge of the Company's daily operations, with a focus on sales of EHang AAV products and solutions[.]"

19. Defendants Hu, Yang, Liu, and Fang are collectively referred to herein as the "Individual Defendants."

20. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

21. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

22. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to EHang under *respondeat superior* and agency principles.

23. EHang and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. <u>DETAILED ALLEGATIONS</u>

### A. Background

24. EHang was founded in 2014. In its first years, EHang principally developed and commercialized AAVs that were not designed to carry passengers. Instead, EHang's earlier vehicles were designed to conduct a variety of other functions such as logistics and aerial media (*i.e.*, the deployment of light-emitting AAVs to create light shows in the sky).

25. EHang, however, was contemporaneously developing AAVs that would serve the much more lucrative – but also much more demanding – passenger market. In 2018, EHang delivered a two-seat passenger-grade AAV, the EHang 216 (EH216), to a customer for testing. The EH216 continues to be EHang's workhorse model to this day.

26. Today, EHang offers several EH216 model AAVs. Of these, most are not permitted to carry passengers. The passenger model is the EH216-S. In October 2023, the EH216-S received an official certification from the Civil Aviation Administration of China (CAAC), permitting it to be used to carry passengers.

27. But the limitations of EHang's AAVs mean that they do not have many uses. EHang reports that its EH216 model's maximum range is 30-35km (18-22 miles).[2] Its maximum flight duration is 21-25 minutes. Its models are electric but a full charge takes 2 hours.

28. Thus, the EH216 series has a limited core market. The non-passenger models, the EH216-F and EH216-L, are primarily used in firefighting and logistics, respectively. Because the EH216-S has such short range and flight duration, it is difficult to make it work as air taxi. Instead, the EH216-S's primary market is aerial sightseeing.

29. With a demonstrably limited market, investors closely monitored EHang's claims about pre-orders.

30. To hear Defendants tell it, by May 2016, EHang had already presold every EH216 it would ever be able to manufacture for years thereafter.

31. EHang's pre-orders were a boon to investors. With such a large pre-order book, investors did not need to worry that EHang would not be able to sell its AAVs. This significantly reduces EHang's risk profile, leaving mostly operational risks.

---

[2] https://www.ehang.com/ehangaav/ (Last accessed: October 14, 2024).

32. The two largest pre-orders in EHang's backlog were a 1,000-unit pre-order from a U.S. biotechnology company, United Therapeutics Corporation, and a pre-order for 100 EH216s from an Indonesian company, Prestige Aviation. These pre-orders made up 85% of EHang's stated pre-order book as of 1,300+ units. EHang's claims about both pre-orders, however, were false:

(a) The United pre-order had been terminated. While EHang had signed an agreement in 2016 to develop an AAV that could service United's proposed business plan of organ delivery, United had also contemporaneously entered into similar agreements with two other companies. EHang had lost the competition with the other companies. EHang's AAVs did not have a long enough range to serve United's needs. By 2022, EHang and United had terminated the agreement.

(b) Prestige Aviation did place a pre-order for EHang's EH216s, but the pre-order was only for approximately 12 units, not 100.

### *B. Prestige Aviation*

33. On April 11, 2022, EHang announced that it had received a 100-unit pre-order of the EH216 from Prestige Aviation. EHang's press release announcing the deal included other details that were designed to give the impression that the pre-order was substantial. For instance, EHang referenced an April 9, 2022 signing ceremony and quoted the Chairman of Indonesia's legislature.

34. The Prestige order was a massive success for EHang. The Asian market was advantageous to EHang because, in Defendants' telling, safety standards were less strenuous than in Europe or America. The Prestige Aviation order was the largest EHang had ever received in the Asian market.

35. Defendants touted the Prestige Aviation order in quarterly earnings press releases, conference calls, and monthly investor presentations throughout the Class Period. *See* Section V.

36. According to Defendants, Prestige Aviation intended to use the EH216s for aerial transportation between Indonesia's many islands.

37. Former Employee 1 ("FE 1") was a flight test engineer working out of EHang's Guangzhou office from April 2020 through May 2023. FE 1 reported to Xiong Qiping, the Department Manager.

38. FE 1's responsibilities included supporting EHang's non-Chinese customers, specifically those in Indonesia and Japan. FE 1 was also involved in EH216 demonstrations for these markets.

39. FE 1 reports that FE 1 travelled to Indonesia to conduct flight demonstration, testing, and training for Prestige Aviation.

40. According to FE 1, while Prestige Aviation did place a pre-order, the order was nowhere close to 100 units. FE 1 reports that the order was about a dozen units. FE 1 knows the total number of units Prestige Aviation ordered because FE 1's responsibilities in Indonesia also included coordinating with EHang's sales team to negotiate the agreements with Prestige Aviation.

41. The circumstances of Prestige Aviation's creation and its leadership corroborate FE 1's claim that Prestige Aviation only placed a small order of approximately a dozen AAVs.

42. In February 2024, EHang disclosed that the EH216-S is offered domestically for RMB2.39 million and for $410,000 outside China. Hence 100 EH216-S units would cost around $41 million.

43. Prestige Aviation itself has no track history. Prestige Aviation had registered capital of about 500 million Indonesian Rupees, or approximately $32,000 USD at current exchange rates. Rudy Salim, its founder and chairman, owned 99% of its shares.

44. Prestige Aviation was formed on April 14, 2021. The very next day, Rudy Salim announced a partnership with EHang on his Instagram account.

45. Salim has no background in aviation. Instead, he owns an Indonesian car dealership, Prestige Image Motorcars. Prestige Aviation's headquarters are located in Salim's car dealership.

46. It is implausible that Salim has the financial means to buy $41 million of EHang's AAVs. Salim is best known as a social media influencer who has promoted, among other things, a new Carl's Jr. branch, a mall arcade event, a water-themed music festival named "Waterbomb," a thematic music festival named "Scream or Dance: The Lost Pyramid," and a Chongqing-style hotpot restaurant.

47. Salim's social media stunts include, among other things, pretending to own a private jet by photoshopping Prestige Aviation's logo on it.

### *C. United Therapeutics*

48. In May 2016, EHang struck a deal with United Therapeutics.

49. United Therapeutics is a U.S. biotechnology company with annual revenues in the billions of dollars.

50. One of United's lines of business is offering goods and services to address the chronic shortage of human organs for transplant. In furtherance of this business line, in the mid-2010s, United developed a business plan to use AAVs to more quickly transport human organs so they can be immediately used in surgery.

51. In the 2016 press release, EHang indicated that United Therapeutics would be willing to buy up to 1,000 EHang AAVs over 15 years.

52. As of the beginning of the Class Period, EHang maintained that the United Therapeutics agreement was still in effect. In its 2021 annual report on form 20-F, EHang stated, as to the United Therapeutics agreement:

> [EHang] may sell 1,000 units of customized AAVs with the organ transport e-helicopter system conforming to the functional specifications by [United] for [sic] according to a 15-year delivery schedule subject to subsequent purchase amendments. Purchase orders are conditional on [EHang] achieving a number of performance milestones and [United] obtaining

required approvals from the FAA and FDA for the internal testing of the AAVs.[3]

53. In addition, in its presentations to investors, EHang prominently included a slide boasting of its unfulfilled pre-orders. For instance, the Q3 2022 earnings presentation stated that EHang had "1,200+ units of passenger-grade AAVs in unfulfilled pre-order book." United Therapeutics made up 1,000 of these, or 83%. On the same slide, EHang also displayed United Therapeutics' logo.

54. According to EHang, these pre-orders were not mere expressions of interest. Rather, it reported that if the conditions precedent to the order are satisfied, then the customer is obligated to purchase the AAVs.

55. Thus, the United pre-order represented a backlog that would take years to fulfill and earn EHang about RMB 2.4 billion, or about $400 million.

56. Contrary to EHang's claims, however, the United pre-order had fallen apart by the beginning of the Class Period.

57. Former Employee 2 ("FE 2") was an assembly test engineer who worked out of EHang's Guangzhou office from June 2021 to October 2023.

58. FE 2 was responsible for various tasks related to flight testing, including executing flight tests, collecting data from flight tests, preparing summaries and feedbacks from flight tests, etc.

59. According to FE 2, EHang did not have a team interfacing with United Therapeutics. Nor did United Therapeutics have any staff visit EHang's offices during FE 2's tenure at EHang.

60. Early during FE 2's tenure, EHang employees traveled to North America to meet with United Therapeutics and conduct flight demonstrations. However, the visits quickly stopped occurring. According to FE 2, no EHang employees traveled to meet with United Therapeutics in either 2022 or 2023.

---

[3] EHang made a substantially similar statement in its 2022 20-F.

61. FE 2's account is corroborated by the Hindenburg Report and United Therapeutics' own statements about the relationship.

62. First, the Hindenburg Report quotes a former EHang employee as saying:

> "EHang partnered with Vodafone for communications, they partnered with Heli-East for helicopter operations, to use heliports in China and Asia-Pacific, they partner with DHL for doing local logistical drones, ***but also, this is, the same as the United Therapeutics [deal]. It's dead—it's a dead end."***
>
> ….
>
> "EHang, they enter the Ambular project… for them, it's a catchy idea, you know, to transport organs and liver, [or] heart, whatever, and say we're going to save lives. For them it was an ice breaker or promotion, marketing. Then these things failed, they lose their power, and what they don't do in China is take it out from the videos or the article[s] in their web[site] because they think that taking it out is like admitting it failed."

63. Second, United Therapeutics' own statements support FE 2's account. At Aero Montreal's International Aerospace Innovation Forum on December 15, 2020, United's founder explained that EHang was just one of three companies United selected to develop AAVs to support its business model. United was also backing U.S.-based Beta Technologies to develop the Alia 250 aircraft and Eco Helicopters to develop an electrically powered version of the Robinson R44 light helicopter. United's founder described each of these partnerships as "shots on goal."[4]

64. Indeed, as United Therapeutics employee Mikaël Cardinal explained for a November 3, 2021 VerticalMag article, United Therapeutics is "tech agnostic" as between the three companies:

[4] https://www.ainonline.com/news-article/2020-12-15/united-therapeutics-digs-deep-back-longer-range-evtol-aircraft

> "If we believe that certain technology could help further the business of serving more patients in the future, ***we want to give equal chance to anyone [who] is serious in the business to succeed***[.]"[5]

65. Thus, EHang was nowhere near as integral to United's business as it claimed. If any of United's other partners developed working models, United's pre-order of EHang AAVs would disappear.

66. Third, EHang was nowhere near meeting United's requirements. At the Forum, United's founder stated that United needed AAVs that could fly around 250 nautical miles (290 miles). EHang's EH216 series AAVs had a range of only 19 miles.

67. Confirming FE 2's account, United Therapeutics has not mentioned EHang since November 2021. Then, in May 2024, United Therapeutics disclosed that it had pivoted away from electric-powered AAVs and had instead been working on a hydrogen-powered AAV since October 2022 with Robinson Helicopter. The work involved refitting Robinson's R44 helicopter, which was already type certified for North American flights. The news confirmed that EHang had been out of the running with United Therapeutics since 2022 at the very latest.

## V. DEFENDANTS' FALSE STATEMENTS

68. On March 29, 2022, EHang issued a press release announcing its Q4 and FY 2021 earnings. The press release quoted Defendant Hu as saying:

> As of March 29, 2022, we have unfulfilled pre-orders [footnote] for over 1,000 units of our passenger-grade AAV products, including the EH216 series and the VT-30, on a cumulative basis. The growing market demand has formed a solid foundation that strengthens our confidence for future revenue growth.
>
> [Text of footnote:] Pre-orders do not obligate the customers to purchase EHang's AAVs unless certain conditions are satisfied. Fulfilment is

[5] https://verticalmag.com/features/united-therapeutics-helping-evtol-developers-succeed/

> expected to take several years and is conditional upon, among other things, achievement of performance milestones and receipt of regulatory approvals.

69. That same day, EHang held a call to discuss its Q4 and FY 2021 earnings ("Q4 2021 Earnings Call"). In prepared remarks, Defendant Hu stated:

> Moving on to sales and marketing, we are pleased to gradually open up a greater Asian market. Following our significant achievements in South Korea, Japan, Indonesia, and Malaysia, we will continue close cooperation with more partners in Southeast Asian countries. More importantly, the orders and the preorders of our passenger-grade AAVs in the past few years have cumulatively surpassed 1,000 units, forming a solid foundation for our future revenue growth.

70. Defendant Hu's statements were false because: (a) EHang was only one of three contestants for United Therapeutics' business; (b) EHang could not sell units to United Therapeutics unless it was first to develop an AAV satisfactory to United; (c) by this time, United Therapeutics had already dropped out of the agreement to pre-order AAVs from EHang; (d) without United Therapeutics' pre-order, EHang did not have "unfulfilled pre-orders for over 1,000 units," but instead had pre-orders for about 100-200 units.

71. On April 11, 2022, EHang issued a press release announcing that it had received a pre-order from Prestige Aviation. The press release stated, in relevant part:

> EHang Holdings Limited (Nasdaq: EH) ("EHang" or the "Company"), the world's leading autonomous aerial vehicle ("AAV") technology platform company, announced that EHang has received a pre-order for 100 units of EH216 AAVs from Prestige Aviation, an Indonesian aviation company and a subsidiary of Prestige Corp., at the contract signing ceremony during the Indonesia International Motor Show 2022 ("IIMS 2022") on April 9, 2022. It's the largest pre-order EHang has received so far for its passenger-grade AAVs in Asia.

72. EHang's statement was false because it overstated the size of Prestige Aviation's pre-order. In truth, Prestige had placed a much smaller pre-order of approximately 12 AAVs. The statement was material because, as Defendants

stated, the Prestige Aviation pre-order would have been EHang's largest in Asia. In truth, it was a middling pre-order.

73. On April 28, 2022, EHang filed its annual report on form 20-F for the year ended December 31, 2021. Defendant Hu signed the 2021 20-F. Defendants Hu and Liu each filed Sarbanes-Oxley ("SOX") certifications in which they certified that:

> I have reviewed this annual report on Form 20-F of EHang Holdings Limited;
>
> [] Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

74. The 2021 20-F stated:

> As of March 31, 2022, ***we have unfulfilled pre-orders for over 1,000 units*** of our passenger-grade AAV products, including EHang 216 series and VT-30, on a cumulative basis. Pre-orders do not obligate the customers to purchase our AAVs unless certain conditions are satisfied. Fulfilment is expected to take several years and is conditional upon, among other things, achievement of performance milestones and receipt of regulatory approvals.

75. Defendants' statement was false because: (a) EHang was only one of three contestants for United Therapeutics' business; (b) EHang could not sell units to United Therapeutics unless it was first to develop an AAV satisfactory to United; (c) by this time, United Therapeutics had already dropped out of the agreement to pre-order AAVs from EHang; (d) without United Therapeutics' pre-order, EHang did not have "unfulfilled pre-orders for over 1,000 units," but instead pre-orders for about 100-200 units.

76. On May 31, 2022, EHang issued a press release announcing Q1 2022 earnings. In the press release, EHang stated:

> In April 2022, EHang received a pre-order for 100 units of EHang 216 from Prestige Aviation, an Indonesian aviation company and a subsidiary of Prestige Corp.

77. The press release also quoted Defendant Hu as saying:

> Excitingly, we welcomed our newly-appointed Chief Operating Officer Mr. Xin Fang on board in February, and saw growing AAV demand from broader Asian markets, with a total of up to 210 units of pre-orders [footnote] obtained so far this year.
>
> [Text of footnote:] Pre-orders do not obligate the customers to purchase EHang's AAVs unless certain conditions are satisfied. Fulfilment is expected to take several years and is conditional upon, among other things, achievement of performance milestones and receipt of regulatory approvals.

78. That same day, EHang held a call to discuss Q1 2022 earnings ("Q1 2022 Earnings Call"). In prepared remarks, Defendant Fang stated:

> [I]n April, we received a preorder for 100 units of EHang 216 from an Indonesian aviation company, Prestige Aviation, and successfully performed the flight demonstration in Jakarta, the capital of Indonesia.

79. In a slide accompanying the presentation, EHang stated:

> In April 2022, EHang received a pre-order for 100 units of EHang 216 from Prestige Aviation, an Indonesian aviation company and a subsidiary of Prestige Corp.

80. Defendants' statements were false because they overstated the size of Prestige Aviation's pre-order. In truth, Prestige had placed a much smaller pre-order of approximately 12 AAVs. The statement was material because the Prestige Aviation pre-order would have been EHang's largest in Asia. In truth, it was a middling pre-order. Moreover, because Defendant Hu's statement that EHang had up to 210 units of pre-orders in the Asian market included the inflated 100-unit Prestige pre-order, the true number of units pre-ordered received in Asian markets was approximately 122.

81. On August 18, 2022, EHang published a press release announcing Q2 2022 earnings. In the press release, EHang stated:

> In April 2022, EHang received a pre-order for 100 units of EHang 216 from Prestige Aviation, an Indonesian aviation company and a subsidiary of Prestige Corp.

82. That same day, EHang held a call to discuss Q2 2022 earnings ("Q2 2022 Earnings Call"). In prepared remarks, Defendant Fang stated:

> In Q2, we received a preorder for 100 units of EHang 216 AAVs from Indonesian aviation company, Prestige Aviation, which is the largest preorder we have received in Asia so far.

83. Then, also in prepared remarks, Defendant Liu stated:

> [W]e have obtained preorders of up to 210 units from customers in Japan, Malaysia, and Indonesia since the beginning of this year, and we see the trend of further expansion in Southeast Asian markets.

84. In the question-and-answer section of the earnings call, analysts inquired about the total number of pre-orders, and Defendant Fang repeated that it had received 210 preorders in 2022:

> Q: I actually have two quick questions. The first one is we saw EHang having been making some good progress in terms of customer acquisitions, especially in Asia over the past few quarters. Just wondering how many preorders we have got so far and when do you plan to start the delivery.
>
> * * * * *
>
> **DEFENDANT FANG**: Hi, team. This is Xin Fang. Let me take your first question about orders. Since the beginning of this year, we have received a total of 210 units of preorders for passenger-grade AAVs in the Asian market.

85. In a slide accompanying the presentation, EHang stated:

> ✓ Pre-order for 100 units of EH216 AAVs from the Prestige Aviation, an Indonesian aviation company and a subsidiary of Prestige Corp

86. Defendants' statements were false because it overstated the size of Prestige Aviation's pre-order. In truth, Prestige had placed a much smaller pre-order of approximately 12 AAVs. The statement was material because the Prestige Aviation pre-order would have been EHang's largest in Asia. Moreover, because Defendants' statements that EHang had 210 units of pre-orders in the Asian market

included the inflated 100-unit Prestige pre-order, the true number of units pre-ordered received in Asian markets was approximately 122.

87. A slide accompanying the presentation stated:




88. EHang's statement was false because: (a) EHang was only one of three contestants for United Therapeutics' business; (b) EHang could not sell units to United Therapeutics unless it was first to develop an AAV satisfactory to United; (c) by this time, United Therapeutics had already dropped out of the agreement to pre-order EHang AAVs; (d) without United Therapeutics' pre-order, EHang did not have unfulfilled pre-orders for 1,200 units but instead had pre-orders for about 200-300 units.

89. On December 2, 2022, EHang held a call to discuss Q3 2022 earnings ("Q3 2022 Earnings Call"). In prepared remarks, Defendant Fang stated:

> On the international front, we have made meaningful progress in two key regions, Asia and Europe. Since the beginning of this year, we have achieved

> the fruitful results in developing Asian markets, including Japan, Malaysia, Indonesia, and Thailand, and have received a total of 210 pre-orders for passenger-grade AAVs.

90. Defendant Fang's statement was false because it overstated the size of Prestige Aviation's pre-order. In truth, Prestige had placed a much smaller pre-order of approximately 12 AAVs. The statement was material because the Prestige Aviation pre-order would have been EHang's largest in Asia. In truth, it was a middling order. Moreover, because Defendant Fang's statement that EHang had 210 units of pre-orders in the Asian market included the inflated 100-unit Prestige pre-order, the true number of units pre-ordered received in Asian markets was approximately 122.

91. In a slide accompanying the earnings call, EHang stated:



92. EHang's statement was false because: (a) EHang was only one of three contestants for United Therapeutics' business; (b) EHang could not sell units to United Therapeutics unless it was first to develop an AAV satisfactory to United; (c) by this time, United Therapeutics had already dropped out of the agreement to pre-order EHang AAVs; (d) without United Therapeutics' pre-order, EHang did not have unfulfilled pre-orders for 1,200 units but instead had pre-orders for about 200-300 units.

93. On March 22, 2023, EHang held a call to discuss Q4 2022 earnings ("Q4 2022 Earnings Call"). In prepared remarks, Defendant Fang stated:

> In overseas markets such as Asia, last year, we were active in the export markets in Japan, Malaysia, Indonesia, and Thailand, secured more than 200 units of pre-orders for EH216 series[.]

94. Defendant Fang's statement was false because it overstated the size of Prestige Aviation's pre-order. In truth, Prestige had placed a much smaller pre-order of approximately 12 AAVs. The statement was material because the Prestige Aviation pre-order would have been EHang's largest in Asia. In truth, it was a middling order. Moreover, because Defendant Fang's statements that EHang had more than 200 units of pre-orders in the Asian market included the inflated 100-unit Prestige pre-order, the true number of units pre-ordered received in Asian markets was approximately 122.

95. On or after October 13, 2023 ("October 2023 Presentation"), EHang published a presentation on its website.[6]

96. The October 2023 Presentation:

---

[6] The presentation stated that EHang "has obtained **the world's first type certificate ("TC") of unmanned eVTOL** officially issued by the Civil Aviation Administration of China." EHang announced the receipt of the certification on October 13, 2023. Thus, the presentation was published on or after October 13.

(a) Claimed, on two separate slides, that EHang's had international (non-Chinese) pre-orders for "1,200+" units;

(b) Included United Therapeutics' logo on a list of "customers and partners"; and

(c) Claimed that Prestige Aviation had placed a pre-order for 100 units.

97. The statements in the October 2023 Presentation were false because: (a) EHang was only one of three contestants for United Therapeutics' business; (b) EHang could not sell units to United Therapeutics unless it was first to develop an AAV satisfactory to United; (c) by this time, United Therapeutics had already dropped out of the agreement to pre-order AAVs from EHang; (d) without United Therapeutics' pre-order, EHang did not have unfulfilled pre-orders for 1,200 units but instead had pre-orders for about 200-300.

98. EHang's statements in the October 2023 Presentation were also false because they overstated the size of Prestige Aviation's pre-order. In truth, Prestige had placed a much smaller pre-order of approximately 12 AAVs. The statement was material because the Prestige Aviation pre-order would have been EHang's largest in Asia. In truth, it was a middling pre-order.

## THE TRUTH EMERGES

99. On November 7, 2023, before the market opened, Hindenburg Research LLC ("Hindenburg"), an investment research firm, released a report entitled "Ehang: Hollow Order Book And Fake Sales Make This China-Based eVTOL Company Last in Line For Takeoff" (the "Hindenburg Report").

100. The Hindenburg Report stated that "EHang's 1,300+ unit preorder book suggests solid demand and serves as the most critical metric for quantifying future revenue potential." However, "[a]fter examining every preorder and partnership [.], ***our research indicates that over 92% of EHang's preorder book***

***is based on deals that were later 'abandoned' or came from customers in no financial position to purchase EHang's aircraft in volume, or at all*.*" (Emphasis added).

101. Regarding United Therapeutics, the Hindenburg Report quoted a former EHang employee as stating that the deal with United Therapeutics was "***dead***." (Emphasis added).

102. The Hindenburg Report also discussed the purported 100-unit pre-order, worth an estimated $30 million (based on the unit price of the applicable EHang aircraft), from Prestige Aviation, which EHang had characterized as an "Indonesian Aviation Company".

103. Hindenburg noted that Prestige Aviation is owned by Rudy Salim, a social media influencer, and stated that "***[o]ne would expect that a $30 million preorder might come from an established aviation company with aircraft, pilots, or any observable aviation-related operations. On the contrary, we couldn't even find a website for Prestige Aviation, much less an active aviation-related business***." (Emphasis added). Further, the Hindenburg Report stated "[t]he company shows just 2 employees on LinkedIn."

104. The Hindenburg Report also noted that "Salim, ***who has no discernible aviation experience, spends much of his time producing self-promotional social media content***." This includes short films where Salim can be seen "***racing supercars and engaging in gun fights with animated villains***." (Emphasis added).

105. The Hindenburg Report further stated that, outside of promotional events with EHang, the only evidence Hindenburg "could find that Prestige had an aviation business ***were several early photos of Prestige Aviation's planes on social media, but they appear to be photoshopped***." (Emphasis added).

106. Hindenburg also highlighted that, three months after the photo with the photoshopped logo had been posted on Instagram, Salim incorporated Prestige Aviation with just ***$34,000 in registered capital*** the day before Salim announced a partnership with EHang on his Instagram account. Further, Hindenburg noted that Prestige Aviation was incorporated with an address that matched a car dealership owned by Salim.

107. Immediately following the adverse disclosures in the Hindenburg Report, the price of EHang ADSs declined by $1.90 per ADS, or 12.7%, to close at $13.06 on November 7, 2023.

108. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiff and other Class members have suffered losses and damages.

## VI. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### *A. EHang Discreetly removes United Therapeutics from its Investor Presentation*

109. As more fully alleged above, on or after October 13, 2023, EHang published a presentation concerning its operations:

(a) Slides 3 and 11 of the presentation claimed that EHang had "1,200+" units in pre-orders;

(b) Slide 19 of the presentation included United Therapeutics' logo.

110. In response to the Hindenburg Report, EHang published a press release stating, in relevant part:

> The accumulated orders and pre-orders the Company has received in the past reflected the strong interest and genuine demand from customers for EHang's innovative electric vertical take-off and landing ("eVTOL") products, which are based on signed contracts and planned for delivery after obtaining regulatory approvals, as per customers' requests.

111. On or before November 22, 2023, EHang issued an updated November presentation ("November 2023 Presentation"). The November 2023 Presentation used the same basic format as the October 2023 Presentation, but there were a few key differences:

(a) EHang amended both slides 3 and 11 to remove the misrepresentation that it had "1,200+" in pre-orders.

(b) EHang deleted slide 19 (which included United Therapeutics' logo).

112. Thus, even as it claimed its pre-orders were based on signed contracts, EHang stopped claiming that it had pre-orders from United Therapeutics.

***B. Pattern***

113. EHang's continuing to claim it had a live agreement with United Therapeutics even after the deal fell apart is part of a pattern.

114. Indeed, EHang has a pattern of portraying agreements and projects with high-profile customers as active, even after those agreements and projects are terminated or abandoned.

115. Slide 19 of the October 2023 Presentation listed EHang's purported "[w]orldwide customers and partners." As alleged above, though the slide included United Therapeutics' logo, the United Therapeutics deal had ended.

116. In addition, the slide also listed four other high-profile customers: DHL, Vodafone, Ambular, and Shenzhen East General Aviation.

117. As to the DHL deal, on May 16, 2019, DHL and EHang jointly announced that they had developed a drone parcel delivery service in Guangzhou.[7] The slickly-produced video EHang released showed a drone with DHL's logo

[7] https://x.com/ehang/status/1129271288239874050 (Last Accessed: October 14, 2024)

delivering a document from point to point. A May 22, 2019 press release quoted Defendant Hu as saying:

> Together with DHL we are very glad to bring the first smart drone delivery service route to China in Guangzhou; this marks a new beginning in building air logistics for smart cities.

118. EHang discussed the DHL deal again on its Q2 2020 earnings call, taking place on August 25, 2020, during which EHang's Chief Strategy Officer stated in response to a question seeking an update about the DHL partnership: "we are in good cooperation with them … we are not going to design the drone for them, we're going to design the whole solution."

119. Then, on October 15, 2021, EHang published a press release quoting Defendant Hu as saying:

> As a leader in the global urban air mobility industry, EHang is committed to providing smart, safe, and eco-friendly AAV products, solutions and services for various sectors and has already cooperated with FACC, DHL, Vodafone, and many other global companies.

120. As to the Vodafone deal, on October 18, 2019, EHang published a press release which provided in relevant part:

> Under the agreement, Vodafone will become EHang's exclusive partner to provide connectivity to all EHang AAVs operating in Europe by equipping them with Vodafone SIM cards. EHang will become Vodafone's exclusive UAM partner.
>
> …
>
> Once the regulatory framework allows, EHang and Vodafone also intend to collaborate on AAV test flights and will further work together on mobility platform services that provide digital and streaming content to AAV passengers while in-vehicle, enable payments, and support identity verification.

121. As to the Ambular agreement, on August 21, 2020, EHang published a press release stating that "has been selected to join Ambular, an international project endeavoring to develop a flying ambulance for medical emergency use."

122. According to EHang, its role was central:

> As the first company in the world to launch and commercialize passenger-grade AAVs, which achieved a new milestone in the deployment and proliferation of Urban Air Mobility ("UAM"), EHang will contribute the necessary hardware (such as rotors and motors) to the Ambular project, thus driving research and development of the power component of the aircraft. EHang's expertise and experience in using AAVs for emergency response is also expected to significantly accelerate development of the project.

123. As to the Shenzhen East General Aviation (commonly referred to as Heli-East or Heli-Eastern) agreement, on September 15, 2021, EHang announced that it had formed a "strategic partnership" with Heli-Eastern. The press release stated:

> The ground-breaking partnership will explore and further implement urban air mobility ("UAM") operations in the designated integrated airspace for helicopters and AAVs in Shenzhen, China. This is an important milestone in implementing EHang's 100 Air Mobility Routes Initiative in the Greater Bay Area.
>
> …
>
> EHang and HELI-EASTERN have joined hands in taking the initiative to build the pilot project focusing on integrated airspace for UAM operations in the Greater Bay Area, responding to the Guidelines of the National Comprehensive Transportation Network Plan issued by the State Council of China in February 2021. The in-depth cooperation aims to form a holistic strategic partnership in the application of innovative AAVs and operational models in the aviation industry, such as developing low-altitude UAM operation management system and exploring specific UAM use cases, including aerial emergency rescue for ground transportation and aerial cargo transportation over the highway network. At the HELI-EASTERN's helicopter base in Shenzhen, both parties featured demo flights with both HELI-EASTERN's helicopter Bell 206 and a passenger-grade AAV EHang 216 flying together to demonstrate live practical UAM operations in an integrated airspace.

124. Then, during EHang's Q3 2021 earnings call on December 2, 2021, Defendant Hu said in prepared remarks:

> Notably, we have been establishing a sample regular air mobility operation model for aerial sightseeing at the vertiport of our partner, HELI-EASTERN, in the oceanfront Maluan Hill area in Shenzhen since middle of November. With a daily frequency of 6 operational trial flights currently, we look to expand flight frequencies to meet increasing market demand. We estimate a full-scale operation in this spot will serve over 30,000 passengers per year.

125. Yet all of these deals had fallen through by October 2023. A former EHang employee told Hindenburg:

> EHang partnered with Vodafone for communications, they partnered with Heli-East for helicopter operations, to use heliports in China and Asia-Pacific, they partner with DHL for doing local logistical drones but also, this is, the same as the United Therapeutics [deal]. It's dead—it's a dead end.
>
> EHang, they enter the Ambular project… for them, it's a catchy idea, you know, to transport organs and liver, [or] heart, whatever, and say we're going to save lives. For them it was an ice breaker or promotion, marketing. Then these things failed, they lose their power, and what they don't do in China is take it out from the videos or the article[s] in their web[site] because they think that taking it out is like admitting it failed.

126. By October 2023, Heli-Eastern had decided that it would purchase AAVs from EHang's competitors instead:

- On June 18, 2023: Heli-Eastern announced that it had reached an agreement to purchase 100 low altitude "flying taxis" from Lilium, an EHang competitor.
- On September 4, 2023, Heli-Eastern entered into an agreement with AutoFlight, another EHang competitor, for the purchase of 100 AAVs.

127. There have been no announcements or news concerning the EHang - Heli-Eastern partnership after EHang's September 2021 press release. Nor are there any announcements or news about Heli-Eastern purchasing AAVs from EHang,

128. As to DHL, Hindenburg quoted a former EHang employee who said "[s]o, you don't hear any more about the DHL-Sinotrans company in China working with EHang. ***Why? Because there were some problems in the integration and then they abandoned the project***, but they don't claim, nobody says 'we closed the project'…***they never admit any failure or any dead ends***." (Emphasis added).

## VII. PLAINTIFF'S CLASS ACTION ALLEGATIONS

129. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the publicly-traded ADSs of EHang between March 29, 2022 and November 6, 2023, both dates inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Also excluded from the Class are persons or entities who suffered no compensable damages under the securities laws during the Class Period.

130. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's ADSs were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

131. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

132. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

133. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and prospects of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company's ADSs during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

134. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

135. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's ADSs met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;
- as a public issuer, the Company filed periodic public reports with the SEC;
- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- the Company's ADSs were liquid and traded with moderate to heavy volume during the Class Period; and
- the Company was followed by securities analysts who wrote reports that were widely distributed and publicly available.

136. Based on the foregoing, the market for the Company's ADSs promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

137. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

138. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

139. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

140. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

141. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's ADSs during the Class Period.

142. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such

statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

143. Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

144. As a result of the foregoing, the market price of the Company's ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's ADSs during the Class Period in purchasing the Company's ADSs at prices that were artificially inflated as a result of Defendants' false and misleading statements.

145. Had Plaintiff and the other members of the Class been aware that the market price of the Company's ADSs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's ADSs at the artificially inflated prices that they did, or at all.

146. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

147. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's ADSs during the Class Period.

## COUNT II
## Violations of Section 20(a) of the Exchange Act
## Against the Individual Defendants

148. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

149. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false statements.

150. As officers of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' business and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

151. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's business and results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the

Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's ADSs.

152. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Class Counsel;

(b) awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## IX. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 14, 2024

**THE ROSEN LAW FIRM, P.A.**
*/s/ Yu Shi*
Yu Shi (*pro hac vice*)
275 Madison Ave, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

Laurence M. Rosen (SBN 219683)

355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Yu Shi*
Yu Shi