Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Plaintiff*
*and the Putative Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZHAN KUI ZHANG, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EHANG HOLDINGS LIMITED, HUAZHI HU, CONOR CHIA-HUNG YANG, RICHARD JIAN LIU, and XIN FANG,<br><br>Defendants. | Case No: 2:23-cv-10165-MWC (DFMx)<br><br>CLASS ACTION<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT EHANG HOLDINGS LIMITED'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>Hon. Michelle Williams Court<br><br>Hearing Date: March 28, 2025<br>Hearing Time: 1:30 PM<br>Courtroom: 6A |

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   STATEMENT OF FACTS ............................................................................... 2

  A.  Company Background and its Claim of Pre-Orders ..................................... 2

  B.  The United Pre-Order: Lucrative but Terminated........................................ 3

  C.  The Prestige Pre-Order: Much Smaller than Claimed ................................. 5

  D.  Hindenburg Reveals the Truth and EHang ADS Price Tumbles.................. 6

III.  EHANG MAY NOT INSERT ITS OWN VERSION OF THE FACTS ......... 6

IV.   ARGUMENT ................................................................................................. 7

  A.  Legal Standard .......................................................................................... 7

  B.  The Complaint Adequately Pleads Falsity.................................................. 8

    1.  EHang Misrepresented the Size of Prestige's Pre-Order ........................... 8

    2.  EHang Misrepresented United's Terminated Pre-Order as Still Active ....10

    3.  Plaintiff Did Not "Blindly Rely" on Hindenburg......................................12

    4.  The Complaint is Not Puzzle Pleading .....................................................13

  C.  The Complaint Adequately Pleads Scienter ...............................................13

  D.  The Complaint Adequately Alleges Loss Causation....................................18

  E.  The Complaint Adequately Alleges a Section 20(a) Claim ........................22

V.    CONCLUSION .............................................................................................22

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Behrendsen v. Yangtze River Port & Logistics Ltd.,*
 2021 WL 2646353 (E.D.N.Y. June 28, 2021)......................................................21

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) ........................................................ 8, 13, 14, 15

*Bielousov v. GoPro, Inc.*,
 No. 16-CV-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017) ...............16

*Bond v. Clover Health Invs., Corp.*,
 587 F. Supp. 3d 641 (M.D. Tenn. 2022)...............................................................21

*Borteanu v. Nikola Corp.*,
 2023 WL 11017679 (D. Ariz. Dec. 8, 2023)........................................................21

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005) ............................................................................................18

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
 751 F.3d 990 (9th Cir. 2014) ..............................................................................14

*Eminence Cap., LLC v. Aspeon, Inc.*,
 316 F.3d 1048 (9th Cir. 2003) ............................................................................22

*Espy v. J2 Glob., Inc.*,
 99 F.4th 527 (9th Cir. 2024) ...............................................................................21

*Gammel v. Hewlett-Packard Co.*,
 2013 WL 1947525 (C.D. Cal. May 8, 2013).........................................................18

*Homyk v. ChemoCentryx, Inc.*,
 2023 WL 3579440 (N.D. Cal. Feb. 23, 2023).......................................................15

ii

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ..............................................................................19

*In re Eros Int'l PLC Sec. Litig.*,
  2021 WL 1560728 (D.N.J. Apr. 20, 2021) ........................................................21

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024) ..................................................................7, 20, 21

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .......................................................................7, 19

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014) ..................................................................13

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...........................................................7, 9

*In re Mullen Auto. Sec. Litig.*,
  2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ..............................................19, 21

*In re Network Assocs., Inc. Sec. Litig.*,
  2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) ...................................................18

*In re Novatel Wireless Sec. Litig.*,
  830 F. Supp. 2d 996 (S.D. Cal. 2011) .................................................................19

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ..............................................................................21

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ..........................................................................8, 9

*In re STEC Inc. Securities Litigation*,
  2011 WL 2669217 (C.D. Cal. June 17, 2011) ...................................................... 8

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ..............................................................................15

*In re Zillow Grp., Inc. Sec. Litig.*,
  2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ................................................11

iii

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...................................................................................6, 8

*Lea v. TAL Educ. Grp.*,
    837 F. App'x 20 (2d Cir. 2020) ....................................................................................20

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ......................................................................................... 6

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..........................................................................................................17

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ......................................................................................18

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017)..................................................................13

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ..............................................................................7, 18, 20

*Pampena v. Musk*,
    705 F. Supp. 3d 1018 (N.D. Cal. 2023) ......................................................................19

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ........................................................................................15

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ......................................................................15

*Skilstaf, Inc. v. CVS Caremark Corp.*,
    669 F.3d 1005 (9th Cir. 2012) ....................................................................................... 7

*Sony Biotechnology, Inc. v. Chipman Logistics & Relocation*,
    2017 WL 3605500 n.3 (S.D. Cal. Aug. 22, 2017)...................................................... 8

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) .................................................................................11, 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ..............................14, 17

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
  2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ......................................................18

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .....................................................................21, 22

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) .......................................................21

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .............................................................................. 9

**Statutes**

15 U.S.C. § 78u-4(b)(2) ........................................................................................14

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................................6, 11

Lead Plaintiff Zhan Kui Zhang ("Plaintiff") respectfully submits this memorandum of points and authorities in opposition to Defendant EHang Holdings Limited's Motion to Dismiss Plaintiffs' Amended Class Action Complaint (Dkt. No. 47).

## I.   PRELIMINARY STATEMENT

Defendant EHang[1] is a China-based technology company that makes and sells AAVs. EHang's AAVs, however, have limited range, a short operating time, and takes hours to recharge. As such, EHang's AAVs do not have a wide market. To make itself attractive to investors, EHang claimed during the Class Period that it already garnered pre-orders for more than 1,200 AAVs – including a 1,000 unit pre-order from American biotechnology company United Therapeutics and a 100 unit pre-order from Prestige Aviation, an Indonesian company. In other words, EHang had already pre-sold more AAVs than it could manufacture for years to come.

EHang's massive book of pre-orders was in fact a Potemkin Village. By the start of the Class Period, United had terminated its pre-order because EHang's AAVs were so far from meeting United's requirements that United had moved on to partnering with another company to develop hydrogen-powered AAVs. The Prestige pre-order was also not what EHang claimed. Prestige, founded by an Indonesian social media influencer with $32,000 in registered capital and headquartered in a car dealership, did not place a 100-unit pre-order; it pre-ordered approximately 12 AAVs.

EHang's façade crumbled on November 7, 2023, when Hindenburg Research, an investment research firm known for taking on some of the biggest corporations

---

[1] Unless otherwise defined, all capitalized terms have the same meaning as defined in the Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") (ECF No. 41) and EHang's Memorandum of Points and Authorities in Support of Motion to Dismiss ("EHang Brief") (ECF No. 47-1).

in the world, issued a report stating that EHang's claim about having 1,200+ AAVs in pre-orders was false. Specifically, Hindenburg revealed – based on interviews with former EHang employees – that the United pre-order had been cancelled, and that Prestige was in no financial position to have pre-ordered 100 AAVs. Plaintiff's own investigation corroborated Hindenburg's findings. A former EHang employee who conducted flight demonstrations and trainings for Prestige in Indonesia confirmed that Prestige did not pre-order 100 AAVs – the actual pre-order was about a dozen AAVs. As to United, another former EHang employee confirmed that visits between EHang and United stopped in 2022, and Plaintiff found that in 2022 United made the decision to move away from pursuing all-electric AAVs to focus on developing a hydrogen-powered AAV with Robinson Helicopter, an American aviation company.

The market reacted swiftly and decisively to the revelations in the Hindenburg Report, with EHang's ADS price tumbling by 12.7% on the same day, damaging unsuspecting EHang investors.

As discussed below, EHang's attacks on the Complaint are meritless and its motion to dismiss should be denied in its entirety.[2]

II.    **STATEMENT OF FACTS**

A.    **Company Background and its Claim of Pre-Orders**

Founded in 2014 in Guangzhou, China, EHang makes and sells AAVs. ¶¶2, 24.[3] In its early days, EHang primarily sold AAVs designed for non-passenger functions, such as AAVs for aerial light shows. ¶24. At the same time, EHang was working to enter the more lucrative passenger AAV market. ¶25. These efforts paid

---

[2] EHang gratuitously states that it was the target of a report by Wolfpack Research in 2021 and that it successfully defended a putative class action lawsuit in the Southern District of New York. The veracity of the Wolfpack report and the outcome of a different lawsuit, of course, have no bearing on the accuracy of the Hindenburg Report or the sufficiency of *this* Complaint.

[3]  All citations to "¶" refer to paragraphs of the Complaint.

2

off when, in 2018, EHang delivered a passenger-grade AAV – the EH216 – to a customer for testing. *Id.*

The EH216 remains EHang's workhorse model to this day. *Id.* EHang currently sells several EH216 models, including the EH216-F (used primarily for firefighting), the EH216-L (used primarily for air logistics), and the EH216-S (the only EH216 model certified by Chinese authorities to carry passengers). ¶¶26, 28.

The EH216 series, however, suffers from critical limitations that severely curtail its market. ¶27. For example, it has a maximum range of only 18-22 miles, and its maximum flight time is only 21-25 minutes. *Id.* After reaching those modest ranges, the EH216s – which are electric-powered – must be recharged, which takes two hours. *Id.* These limitations make it difficult for the EH216-S to be used as an air taxi; instead, its main market is aerial sightseeing. ¶28.

As a relatively young company in a nascent industry selling products with major practical limitations, EHang needed to show investors that there is a market for its products. ¶¶2, 29. Accordingly, EHang repeatedly told investors during the Class Period that it had already secured pre-orders for more than 1,200 AAVs; in other words, it had already pre-sold every AAV it could manufacture for the next several years. ¶¶30, 87, 89. Of the 1,200+ AAVs in EHang's pre-order book, 1,100 (or more than 90%) came from just two companies: a 1,000-unit pre-order by United Therapeutics, and a 100-unit pre-order by Prestige Aviation. ¶33, 52.

Neither the United pre-order nor the Prestige pre-order, however, was what EHang claimed. While EHang did have an agreement with United for the latter to purchase 1,000 AAVs, United had terminated the pre-order by the start of the Class Period. ¶¶5, 48-67. As to the Prestige pre-order: the actual pre-order was for approximately a dozen units of the EH216, not 100 units. ¶¶6, 33-47.

**B.    The United Pre-Order: Lucrative but Terminated**

United is a publicly-traded American biotechnology company with billions of dollars in annual revenue. ¶49. In the mid-2010s, United began to explore the

3

possibility of using AAVs to more quickly transport human organs for transplant. ¶50. Towards that end, United formed partnerships with three AAV companies to see which one could develop an AAV suitable for United's prospective organ transport business. ¶63. EHang – along with two American companies, Beta Technologies and Eco Helicopters – were chosen for this project. *Id.* As an indication of the difficulty of this project, United described the three partnerships as "shots on goal" and stated that it was tech-agnostic between the three companies. *Id.*

United's pre-order agreement with EHang, signed in 2016, called for United to purchase 1,000 AAVs from EHang if EHang managed to successfully develop an AAV that met United's requirements and obtained the necessary regulatory approvals from American regulators. ¶¶48, 52. This was a massive pre-order that would earn EHang about $400 million dollars. ¶55.

EHang was eager to tout this lucrative pre-order from a high-profile U.S. company. ¶53. For example, in presentations accompanying EHang's quarterly earnings calls for the second and third quarters of 2022, EHang displayed slides that prominently stated that it had 1,200+ units of AAVs in its unfulfilled pre-order book, and included United's name and logo on those slides. *Id.,* ¶¶87, 89.

Unbeknownst to investors, however, United had cancelled its pre-order with EHang by the start of the Class Period. ¶56. EHang's AAVs, the most advanced of which only had ranges of 18-22 miles, were nowhere close to meeting United's requirement of 290 miles. ¶¶27, 66. Indeed, in 2022, United had pivoted to working with Robinson Helicopter on a developing a hydrogen-powered version of Robinson's R44 helicopter, which was already type-certified for North American flights. ¶67. United now views this as a more realistic option than trying to obtain regulatory approval for all-electric AAVs. Ex. 30 to Nguyen Decl.[4]

---

[4] "Nguyen Decl." refers to the Declaration of Linh K. Nguyen, filed with EHang's Motion to Dismiss (ECF No. 48).

The accounts of former EHang employees provide further corroboration that United's pre-order had been terminated.  FE2, who worked at EHang from June 2021 to October 2023 as an assembly test engineer responsible for various flight testing tasks, said that early during his tenure, EHang employees would travel to North America to meet with United and conduct flight demonstrations. ¶¶57-60. These visits, however, quickly stopped and no EHang employees traveled to meet with United in 2022 or 2023. ¶60. Nor did United send anyone to visit EHang during this time. ¶59. A former EHang employee bluntly told Hindenburg that the United pre-order was "dead." ¶62.

## C.    The Prestige Pre-Order: Much Smaller than Claimed

EHang announced on April 11, 2022 that it had secured a pre-order from Prestige for 100 units of the EH216. ¶33. This pre-order was significant because it represented by far EHang's largest pre-order in Asia, which had become a market of focus for EHang because of its less stringent safety standards. ¶34.

In reality, Prestige's pre-order was far more modest. According to FE1, a former EHang flight test engineer responsible for conducting flight demonstrations and trainings in Indonesia, Prestige's pre-order was for approximately a dozen EH216s – not 100. ¶¶37-40. FE2 was intimately familiar with the Prestige pre-order because FE2 personally conducted flight demonstrations and training for Prestige in Indonesia, and also coordinated with EHang's sales team to negotiate the pre-order agreement with Prestige. *Id.*

One hundred EH216s cost approximately $41 million. ¶42. The circumstances of Prestige's creation and its owner strongly corroborate FE2's account that Prestige had placed a much smaller pre-order of approximately 12, and not 100, EH216s. Prestige was founded by Rudy Salim, best known for being a social media influencer promoting restaurants and music festivals, and owning a car dealership. ¶41. Salim has no background in aviation (other than pretending to own a private jet by photoshopping Prestige's logo on it and posting the image on social media). ¶¶45,

5

47. He formed Prestige on April 14, 2021, and the very next day, announced a partnership with EHang. ¶¶43, 44. Prestige had about $32,000 in registered capital and is headquartered in Salim's car dealership. ¶¶43, 45. Prestige has no track record whatsoever owning or operating AAVs or any other type of flights. ¶43.

### D.   Hindenburg Reveals the Truth and EHang ADS Price Tumbles

On November 7, 2023, before the market opened for trading, Hindenburg released the Hindenburg Report, revealing that the United pre-ordered had been cancelled and that Prestige could not have pre-ordered 100 EH216s. ¶¶7, 9. The market reacted swiftly to Hindenburg's adverse disclosures, as the price of EHang's ADSs declined a whopping 12.7% on November 7, 2023, damaging Plaintiff and other EHang investors. ¶¶8, 107.

Even as it denied the Hindenburg Report, EHang's November 2023 investor presentation – EHang's first investor presentation following the Hindenburg Report – deleted the claim that EHang had "1,200+" units in pre-orders and also removed United's logo. ¶¶110-112.

### III.   <u>EHANG MAY NOT INSERT ITS OWN VERSION OF THE FACTS</u>

EHang requests that the Court take judicial notice of *38* exhibits. ECF No. 51. It is axiomatic that courts may not consider materials outside of the pleadings when assessing the sufficiency of a complaint under Fed. R. Civ. P. 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). The Ninth Circuit in *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) warned of the "concerning pattern" of defendants in securities cases "exploiting" the incorporation-by-reference doctrine and judicial notice in an improper attempt to undermine well-pled allegations. *Id.* at 998. Defendants may not "present their own version of the facts at the pleading stage" through judicial notice and the incorporation-by-reference doctrine. *Id.* at 999. A court may neither "take judicial notice of disputed facts" nor "assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 999, 1003. Accordingly, to

the extent the Court takes judicial notice of these documents, it may only take notice of the fact that statements in those documents *were made*, and not for *the truth of the matter* asserted therein, and any attempt by EHang to use these exhibits to defeat Plaintiff's adequately pled claims is improper.

## IV.    <u>ARGUMENT</u>

### A.    **Legal Standard**

On a motion to dismiss, the court "accept[s] all factual allegations in the complaint as true and constru[es] them in the light most favorable to the [plaintiff]." *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "Even under the [PSLRA], plaintiffs are only required to plead facts, not to produce admissible evidence." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). Thus, dismissal is inappropriate "unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

"To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission (falsity), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re*

*Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024). Here, EHang challenges falsity, scienter, and loss causation.[5]

## B.   The Complaint Adequately Pleads Falsity

Section 10(b) of the Exchange Act and Rule 10b-5 make it "unlawful . . . [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). A statement is misleading "if it would give a reasonable 'investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "[W]hether a public statement is misleading . . . is a mixed question to be decided by the trier of fact," *In re STEC Inc. Securities Litigation*, 2011 WL 2669217, at *9 (C.D. Cal. June 17, 2011), and may not be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Orexigen*, 899 F.3d 988 at 1014.

The Complaint meets these criteria and adequately pleads falsity.

### 1.   EHang Misrepresented the Size of Prestige's Pre-Order

Throughout the Class Period, EHang repeatedly told investors that it had secured a pre-order from Prestige for 100 EH216s. In truth, Prestige placed a much smaller pre-order of approximately 12 EH216s.

This allegation is based on the testimony of FE1, who was personally on the ground in Indonesia conducting flight demonstrations and trainings for Prestige and

---

[5] EHang does not contest that Plaintiff adequately pled the third, fourth, and fifth elements of their Section 10(b) claim. As a result, Plaintiff has satisfied his pleading burden for those three elements. *See Sony Biotechnology, Inc. v. Chipman Logistics & Relocation*, 2017 WL 3605500, at *2 n.3 (S.D. Cal. Aug. 22, 2017) ("[b]ecause [] argument was not raised in [defendants'] motion to dismiss, the argument is waived").

8

coordinating with EHang's sales team to negotiate the pre-order agreement with Prestige. ¶¶37-40.

EHang's attack on FE1 is not well-founded. A complaint relying on confidential witness statements must describe the confidential witness "with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009). The Complaint does that, describing FE1's job title and duties, the time period of FE1's employment at EHang, and to whom FE1 reported. ¶¶37-38. Additionally, the Complaint describes: (a) FE1's familiarity with Prestige - *i.e.* FE1 travelled to Indonesia to conduct flight demonstrations, testing, and training for Prestige. ¶39; and (b) FE1's knowledge of Prestige's pre-order – *i.e.* FE1 responsibilities in Indonesia included coordinating with EHang's sales team to negotiate the sales agreement with Prestige. ¶40. This is sufficient to establish that FE1 had personal knowledge concerning the size of Prestige's pre-order. *QSI,* 865 F.3d at 1145 (confidential witnesses reliable where complaint alleges their "job description and responsibilities, and, in some instances, the witness's exact title.").

EHang's remonstration is that FE1 did not work in EHang's sales department. But FE1 did not need to have been a sales employee to know about Prestige's pre-order, *especially* when FE1 was in Indonesia doing flight demonstrations for Prestige (essentially marketing EHang's AAVs to Prestige) *and* worked with the sales team while in Indonesia to negotiate the sales agreements with Prestige.[6]

The circumstances of Prestige's founding and its history further bolster FE1's testimony that Prestige placed a modest pre-order of 12 EH216s, and not a massive

---

[6] Even if, *arguendo*, FE1 only heard about the number of EH216s that Prestige pre-ordered from colleagues on the sales team, that is not a reason to reject FE1's testimony at the pleading stage. *McKesson,* 126 F. Supp. 2d at 1272 ("Even under the [PSLRA], plaintiffs are only required to plead facts, not to produce admissible evidence.").

9

100-unit pre-order costing approximately $41 million and which would be EHang's largest in Asia. Among other things indicating that it was not a large operation, Prestige was founded by social media influencer Rudy Salim *one day* before it announced a partnership with EHang, had only $34,000 in registered capital, was headquartered in Salim's car dealership, and had no history of engaging in any business (let alone any track record operating flights). ¶¶41-47. Indeed, Prestige's financial condition and history are far more commensurate with it having placed a 12-unit pre-order than a 100-unit pre-order.

### 2. EHang Misrepresented United's Terminated Pre-Order as Still Active

In 2016, United agreed to purchase 1,000 AAVs from EHang on the condition that EHang successfully develops an AAV suitable for United's organ transplant business and obtains necessary regulatory approvals. ¶¶48-54. By the start of the Class Period, however, United had terminated this pre-order; nevertheless, throughout the Class Period EHang continued to tout United's 1,000-unit pre-order and maintain that it was still in effect.

The Complaint pleads multiple indicia that, together, plausibly establish that United's pre-order had been cancelled.

First, the United pre-order, at 1,000 units, was a massive pre-order valued at more than $400 million. ¶55. It was in a developmental phase, meaning that one would expect there to be ongoing flight demonstrations and visits between EHang and United personnel. Yet, these flight demonstrations and visits stopped after 2021, such that there was not a single flight demonstration or visit between EHang and United employees in 2022 and 2023. ¶60. While EHang argues the lack of visits between EHang and United after 2021 was consistent with EHang starting to focus more on the Asian market, it is *also* consistent with EHang's pre-order agreement with United being terminated. "If there are two alternative explanation, one advanced by defendant and the other advanced by plaintiff, both of which are

10

plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Second, United was concurrently partnering with several other AAV companies to see which one could make an AAV suitable for United's needs, with United describing each partnership as "shots on goal." ¶63. By 2022, with EHang nowhere close to meeting United's requirements (indeed, United needed AAVs that could fly 290 miles, while EHang's most advanced AAV had a range of only 18-22 miles), United had moved on to developing a hydrogen-powered AAV with Robinson Helicopter. ¶¶66-67. Indeed, United now views hydrogen-powered AAVs as the more realistic option for gaining regulatory approval than electric-powered AAVs from companies like EHang. Ex. 30 to Nguyen Decl.

Third, Hindenburg interviewed a former EHang employee who confirmed that the United pre-order was "dead." ¶62. This is consistent with FE2's testimony that flight demonstrations and visits between EHang and United stopped after 2021, and the news that United had pivoted away from electric AAVs to developing a hydrogen-powered AAV with Robinson Helicopter. The "consistent and interlocking nature" of anonymous witness testimony "bolsters the evidence's reliability and credibility." *In re Zillow Grp., Inc. Sec. Litig.,* 2019 WL 1755293, at *5 (W.D. Wash. Apr. 19, 2019) (internal citations omitted). Together, these allegations plausibly establish that United's pre-order was no longer in force by the start of the Class Period in 2022.[7]

---

[7] EHang argues that the Complaint does not allege when United cancelled the pre-order. The Complaint does. *See, e.g.:* ¶5 ("By the start of the Class Period, the United Therapeutics pre-order had already been cancelled."; ¶56 ("the United pre-order had fallen apart by the beginning of the Class Period."); ¶67 ("EHang had been out of the running with United Therapeutics since 2022 at the latest."). Because the United pre-order was already cancelled before the start of the Class Period, Defendants' Class Period statements touting an active 1,000 unit pre-order from United were false and misleading.

11

In support of its argument that United had not cancelled its pre-order, EHang points out that the website of Unither Bioelectronics, United's subsidiary, still shows EHang's logo. This is hardly probative that United still has an active pre-order to buy 1,000 AAVs from EHang. For example, Unither's website appears to not be updated regularly. Other than a single piece of news from 2022, all the other entries are from 2019 or earlier. *See* Ex. 9 to Nguyen Decl. Moreover, Unither's website does not list Robinson Helicopter or show its logo even though United had announced a partnership with Robinson to develop a hydrogen-powered AAV for its organ transplant business. *Id.* Finally, even if *arguendo* the presence of EHang's logo on Unither's website indicates *some* sort of active agreement between United and EHang, it does not mean that the *specific agreement to purchase 1,000 AAVs* is still active.

### 3. Plaintiff Did Not "Blindly Rely" on Hindenburg

Contrary to EHang's assertion, Plaintiff did not "blindly rely" on the Hindenburg Report. For example, Plaintiffs corroborated Hindenburg's findings and conclusion about the size of Prestige's pre-order by interviewing FE1, who confirmed that Prestige's pre-order was indeed nowhere close to 100 units. As to the United pre-order, Plaintiff interviewed FE2 who confirmed that flight demonstrations and visits between EHang and United stopped after 2021, and Plaintiff also located other sources indicating that United had entered into partnership with several other companies, and that by 2022, United had pivoted to partnering with Robinson Helicopter to develop a hydrogen-powered AAV.

Indeed, the Hindenburg Report makes other findings against EHang that Plaintiff did not include in the Complaint. *See* Ex. 27 to Nguyen Decl. That Plaintiff's Complaint alleges only false statements as to the United and Prestige pre-orders – which Plaintiff was able to independently corroborate – and not the other charges levied in the Hindenburg Report undermines any inference that Plaintiffs "blindly rel[ied] on" and "parroted" the Hindenburg Report.

12

**4.    The Complaint is Not Puzzle Pleading**

EHang argues in a footnote that the Complaint constitutes "puzzle pleading" and should dismissed on that ground alone. A "puzzling pleading" is a "complaint that forces the defendants and/or court to sort out the alleged statements and match them with the corresponding adverse facts in order to solve the puzzle of interpreting Plaintiff's claims." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014). No such exercise is needed here. It is clear what fraud is being alleged in this concise, 33-page Complaint: (1) Defendants said Prestige placed a pre-order of 100 EH216s when the true pre-order size is about a dozen EH216s, and (2) Defendants said EHang has an active pre-order of 1,000 units from United when this pre-order had already been terminated.[8]  This is not a complaint that requires great effort to decipher. The Complaint quotes Defendants' public statements and explains why each statement is false or misleading. *See, e.g., Murphy v. Precision Castparts Corp.,* 2017 WL 3084274, at *7 (D. Or. June 27, 2017), report and recommendation adopted sub nom. *Murphy v. Precision Castparts Corp.,* 2017 WL 3610523 (D. Or. Aug. 22, 2017) (rejecting defendant's puzzle pleading argument and finding complaint alleging misstatements, along with the reasons each statement is false or misleading, to be sufficiently particularized).

**C.    The Complaint Adequately Pleads Scienter**

To adequately allege scienter, "Plaintiffs must 'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*,

---

[8] As a result, Defendants' statements where they presented a cumulative number of pre-orders that included the cancelled United pre-order and/or the inflated Prestige pre-order are also rendered false, and Plaintiff explains why. *See, e.g.,* ¶86 ("because Defendants' statements that EHang had 210 units of pre-orders in the Asian market included the inflated 100-unit Prestige pre-order, the true number of units pre-ordered received in the Asian markets was approximately 122."); ¶88 ("without United Therapeutics' pre-order, EHang did not have unfilled pre-orders for 1,200 units but instead had pre-orders for about 200-300 units.").

13

527 F.3d at 987 (quoting 15 U.S.C. § 78u-4(b)(2)). In *Tellabs*, the Supreme Court held that scienter is adequately pled where the inference of fraud is cogent and at least *equally* as likely as any non-culpable explanation of the alleged conduct. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). The appropriate inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. In other words, "*a tie goes to the plaintiffs* when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014) (emphasis added). The Complaint satisfies this standard.

First, the United and Prestige pre-orders were of paramount importance to EHang, comprising almost the entirety of EHang's claimed book of pre-orders. EHang told investors that it had pre-orders of 1,200+ AAVs during the Class Period. The United and Prestige pre-orders accounted for nearly 92% of that figure. The United pre-order alone was 83% of EHang's total book of pre-orders. The Prestige pre-order was EHang's largest in Asia, a market of growing importance and focus for EHang. In this regard, Defendants' scienter here is comparable to that in *Berson*. There, the plaintiff alleged that the defendants failed to disclose stopwork orders received from a company's largest customers that accounted for more than 80% of the company's revenue. The Ninth Circuit noted that though the plaintiffs "allege no particular facts indicating that [the officers] actually knew about the stop-work orders . . . it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work." *Berson*, 527 F.3d at 987-88. The Ninth Circuit thus concluded that the facts alleged "support the inference that the backlog statements were misleading when made.

14

These facts were prominent enough that it would be absurd to suggest that top management was unaware of them." *Id*. at 989. The same is true here. Given the magnitude and importance of the United and Prestige pre-orders, it would be absurd to suggest that the Individual Defendants (the CEO, CFO, and COO of EHang)[9] were unaware that United had terminated its pre-order, or did not know the true size of Prestige's pre-order.

Second, Defendants Hu, Fang, and Liu each issued statements about the United and/or Prestige pre-orders during the Class Period, including touting the size of the pre-orders. [10] Defendants' specific misstatements about matters they purportedly knew regarding the United and Prestige pre-orders strongly support an inference of scienter. As the Ninth Circuit has explained, where defendants make misstatements about specific matters they purport to know, "[i]t is unclear what further facts plaintiffs would need to know to plead to create a stronger inference that [they] had access to [the] information [they] discussed publicly." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014). This is particularly true here. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("public statements celebrating the merger as an unprecedented success" supported scienter); *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *19 (N.D. Cal. Feb. 23, 2023) (scienter found where CEO repeated discussed drug trials and data "in detail" with

---

[9] To Plaintiff's knowledge, the Individual Defendants are Chinese nationals residing in China. Because counsel for EHang has not agreed to accept service for the Individual Defendants, Plaintiff has sent a request to the Chinese government, pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, to serve the Individual Defendants with the Complaint and summons in China. Based on Plaintiff's counsel's experience, it typically takes the Chinese authorities anywhere from six to twelve months to effectuate service. Fed. R. Civ. P. 4(m)'s time limit for service does not apply to service in foreign countries. S*ee* Fed. R. Civ. P. 4(m) ("This subdivision does not apply to service in a foreign country under Rule 4(f)[.]").

[10] *See, e.g.:* Hu (¶¶68-69, 77), Fang (¶¶78, 82, 84, 89, 93), Liu (¶¶83).

15

investors throughout the class period and "opin[ed] on the significance of particular data"); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017) (actual access inferred when defendants "referenc[ed] the data directly"); *Bielousov v. GoPro, Inc.*, No. 16-CV-06654-CW, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (defendants "boasted [about] closely track[ing] its inventory").

Third, in the November 2023 Investor Presentation, issued shortly after the Hindenburg Report, EHang stopped claiming that it had pre-orders of 1,200+ AAVs and removed United's logo.[11]  This supports scienter. EHang's suggested inference – that it merely "re-designed its investor presentation" – is unpersuasive. It strains credulity to imagine that a simple "re-design" would entail removing references to EHang's most high-profile customer and its largest pre-order. The more plausible inference is that EHang was tacitly and quietly distancing itself from its prior false claims about United and its inflated pre-order book. In any event, even if both inferences are equally plausible (and they are not), the tie goes to the Plaintiff. *Starr,* 652 F.3d at 1216 (9th Cir. 2011) ("If there are two alternative explanation, one advanced by defendant and the other advanced by plaintiff, both of which are

---

[11] EHang appears to have misread the Complaint, erroneously arguing that Plaintiff alleged that EHang removed United's logo and references to having 1,200+ pre-orders from its **October 2023** Investor Presentation. *See* EHang Brief (ECF No. 47-1 at Page ID#: 395). The Complaint clearly alleges that in its October 2023 Investor Presentation, EHang was still boasting of having 1,200+ units in pre-orders and displayed United's logo, and but the November 2023 Investor Presentation (the first investor presentation issued after the Hindenburg Report) removed those references. ¶¶109-112.

plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).").[12]

Fourth, that EHang appears to have a pattern of continuing to present terminated agreements as live deals supports scienter. For example, EHang announced in 2021 that it struck an agreement with Heli-Eastern for air taxi operations. ¶123. A former EHang employee told Hindenburg that this deal was dead by October 2023, and Plaintiffs have independently confirmed that Heli-Eastern purchased 200 AAVs from two of EHang's competitors in 2023, and none from EHang. ¶¶125-127. Yet, EHang's October 2023 Investor Presentation continued to display Heli-Eastern as a customer. ¶116. Indeed, another former EHang employee told Hindenburg that EHang "never admit[s] any failure or any dead ends." ¶128.

Together, the inference of scienter is at least as plausible as any other non-culpable inference. EHang contends that a lack of stock sales by the Individual Defendants negates scienter. The Supreme Court, however, has declared that "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (the "absence of a motive allegation" is "not dispositive"). Thus, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the

---

[12] EHang argues that scienter is negated because EHang's latest annual report still references the United pre-order. There are several explanations for that, none of which undermines scienter. For example, annual reports are publicly-filed with the SEC, and to remove the discussion of the United agreement in an annual report would be tantamount to a very public admission of guilt (in contrast, the investor presentations are not publicly filed with any regulators and an investor must specifically search for it to find it). Additionally, annual reports are dense documents spanning hundreds of pages, and prior year's annual reports are often used as template for preparing the current year's annual report (*i.e.* they are not drafted from scratch); accordingly, EHang could simply have neglected to remove those paragraphs when updating its prior year's template.

17

class period." *No. 84 Employer-Teamster Joint Council Pension Plan Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 944 (9th Cir. 2003). This is especially true when Defendants repeatedly touted the United and Prestige pre-orders. "It is far from implausible that a corporate executive who had spent months building excitement and momentum around important, new technology products might recklessly misrepresent the inability to deliver on those promises." *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013).

EHang also argues that the lack of any confidential witnesses speaking directly to the Individual Defendants' state of mind negates scienter. Not so. Courts in this circuit have recognized that scienter is often pled "through circumstantial evidence," *In re Network Assocs., Inc. Sec. Litig*., 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5, 2000), and confidential witness allegations supports findings of scienter even if they did not have personal knowledge of any defendant's state of mind. *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012). ("Although the confidential witness allegations do not directly show that the Defendants knew their statements were false, the allegations do provide critical background information … that supports the court's finding [of scienter]. The Plaintiffs' failure to recruit a confidential witness with personal knowledge of the Defendants' mental state does not mean the allegations must be disregarded altogether.").

**D.     The Complaint Adequately Alleges Loss Causation**

To recover for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must establish "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). A plaintiff may establish loss causation by showing that a corrective disclosure caused the stock price to decline. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). A "corrective disclosure" is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market.

18

*In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011). A "corrective disclosure can ... come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." *Id.*

Courts in this Circuit have repeatedly observed that loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Pampena v. Musk*, 705 F. Supp. 3d 1018 (N.D. Cal. 2023) (quoting *In re Gilead,* 536 F.3d at 1057). At the motion to dismiss stage, pleading loss causation "should not prove burdensome" – the Complaint need only provide Defendants "notice of plaintiff's loss causation theory and provide the court some assurance that the theory has a basis in fact." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead*, 536 F.3d at 1057.

Here, the Complaint alleges that the price of EHang's ADSs plummeted by 12.7% in reaction to the Hindenburg Report, which revealed the truth about the United and Prestige pre-orders. ¶¶ 6-7. EHang makes three arguments against loss causation, none of which have merit.

First, EHang argues that the Hindenburg Report cannot serve as a corrective disclosure because it included a disclaimer stating that it was based on public sources. But the Hindenburg Report includes more than readily available public information. For example, its findings about the United pre-order (and EHang's pattern of representing other dead deals as live) were based on interviews with confidential witnesses.[13] *See In re Mullen Auto. Sec. Litig.,* 2023 WL 8125447, at *11 (C.D. Cal. Sept. 28, 2023) ("although the [Hindenburg] Report contains a disclaimer that the information is obtained from 'public sources we believe to be accurate and reliable,' this disclaimer is not tantamount to stating that all the

---

[13] Indeed, in its motion, EHang attacks the accuracy of the Hindenburg Report *because* it was based on interviews with confidential former employees of EHang.

information is available and known to investors already."); *see also, Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (holding that a short seller report was a corrective disclosure despite its disclaimer that "all information contained herein … has been obtained from public sources" because the report was based on, among other things, interviews with confidential witnesses). There is a good reason why short seller reports add disclaimers about being based on public information: to avoid charges of insider trading.

Indeed, the Ninth Circuit has explained that even if a piece of information exists in the public domain, it does not mean it was "readily available to the public." *In re Genius Brands Int'l, Inc. Sec. Litig.,* 97 F.4th 1171, 1186–87 (9th Cir. 2024) ("securities issuers should not escape liability for misrepresentations merely because they can show that corrective information was publicly available on some webpage tucked in a deep corner of the internet"). The Court in *Genius Brands* held that a Nickelodeon Jr. broadcast schedule publicly posted on Nickelodeon's website was not readily available to the market and had no significance to investors until "the Hindenburg Report synthesized it for the marketplace." *Id.*

Second, EHang argues that because the Hindenburg Report was written by a short seller who stood to profit if EHang's share price fell, investors did not view it as a corrective disclosure. But investors ***did*** view the Hindenburg Report as such: EHang's share price dropped by a whopping 12.7% on the day of the Hindenburg Report. This dramatic market reaction to the Hindenburg Report provides "strong evidence of how reasonable investors view the significance of the information" and that the revelations in the Hindenburg Report were not previously known to investors. *Am. W.,* 320 F.3d at 948. Indeed, numerous courts in this Circuit and throughout the country have found loss causation adequately pled with a

20

Hindenburg report serving as corrective disclosure.[14]  Moreover, not all short seller reports are created equal. Hindenburg is a well-known short seller whose reports garner the market's attention. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 541 (9th Cir. 2024) ("Hindenburg [is] a well-known short-seller firm[] whose reports are not 'anonymous,' unlike the blog posts in *BofI* and *Grigsby* or the Plainview report in *Nektar,* which had no associated contact information that would allow investors to verify the report's reliability."). Here, the market clearly did pay attention and react to the Hindenburg Report.

Lastly, EHang argues that there is no loss causation because EHang's ADS price ultimately rebounded, citing to *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021). *Wochos*, however, is easily distinguishable. In *Wochos*, the stock price fell by a mere 3.9% (from $356.88 per share to $342.94 per share) upon the alleged corrective disclosure, but then rebounded almost completely the *next day* to $355.59 a share. Accordingly, *Wochos* held that where there was a "**modest**" drop in the stock price upon the disclosure of certain news but then recovers "very shortly after," the allegation of loss causation "may be" insufficient. *Id.* at 1197. In support of that proposition, *Wochos* cites to *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010), which stated that "To adequately plead loss causation…a plaintiff must allege that the 'share price *fell significantly* after the truth became known.'" Here, EHang's ADS price fell by 12.7% per share following the

---

[14] *Genius Brands,* 97 F.4th 1171 ("shareholders have plausibly alleged that the truth became known through the Hindenburg Report"); *Borteanu v. Nikola Corp.*, 2023 WL 11017679, at *20 (D. Ariz. Dec. 8, 2023) ("Plaintiff has sufficiently put forth factual information suggesting that the Hindenburg Report revealed new information which challenged the above deceptive acts, causing a market reaction."); *Mullen Auto. Sec. Litig.*, 2023 WL 8125447 (same); *See also, Behrendsen v. Yangtze River Port & Logistics Ltd.,* 2021 WL 2646353 (E.D.N.Y. June 28, 2021*); Yannes v. SCWorx Corp.,* 2021 WL 2555437, at *8 (S.D.N.Y. June 21, 2021); *In re Eros Int'l PLC Sec. Litig.,* 2021 WL 1560728, at *9 (D.N.J. Apr. 20, 2021*); Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641 (M.D. Tenn. 2022).

Hindenburg Report, satisfying *Oracle*'s requirement of a significant stock drop, and distinguishing it from the modest 3.9% stock drop in *Wochos*. Additionally, unlike in *Wochos* where the stock price recovers almost completely the *next day*, here EHang's ADS price continued to fall even lower in the days following the Hindenburg Report, dipping as low as $12.99 per share on November 10, 2023. *See* Ex. 28 to Nguyen Decl. It wasn't until November 17, 2023, ten days after the Hindenburg Report, that its ADS price recovered. *Id.* As such, this case is nothing like the situation contemplated by *Wochos.*

## E.    The Complaint Adequately Alleges a Section 20(a) Claim

EHang's only argument against the Section 20(a) claim is that Plaintiff did not adequately plead a primary violation of Section 10(b). Accordingly, if the Court finds that the Section 10(b) claim is adequately pled, then the Complaint also adequately pleads a claim under Section 20(a).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, EHang's motion to dismiss should be denied in its entirety. If the Court grants EHang's motion, Plaintiff respectfully requests leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Dated: January 31, 2025                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           */s/ Yu Shi*
                                           Yu Shi (*pro hac vice*)
                                           275 Madison Ave, 40th Floor
                                           New York, NY 10016
                                           Telephone: (212) 686-1060
                                           Facsimile: (212) 202-3827
                                           Email: yshi@rosenlegal.com

                                           Laurence M. Rosen (SBN 219683)
                                           355 South Grand Avenue, Suite 2450
                                           Los Angeles, CA 90071

Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of January, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Yu Shi*
Yu Shi

24