UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.  2:23-cv-10165 MWC (DFMx)          Date: March 26, 2025

Title     Damien Pujo v. EHang Holdings Limited *et al.*

Present: The Honorable:     Michelle Williams Court, United States District Judge

| T. Jackson | No Reporter |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings: (IN CHAMBERS) ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND (DKT. 47)**

Before the Court is a motion to dismiss by Defendant EHang Holdings Limited ("EHang").  Dkt. # 47 ("*Mot.*").  Lead Plaintiff Zhan Kui Zhang ("Plaintiff") opposed, Dkt. # 55 ("*Opp.*"), and EHang replied, Dkt. # 56 ("*Reply*").  The Court finds the matter appropriate for decision without oral argument.  *See* Fed. R. Civ. P. 78; L.R. 7-15.  Having considered the moving and opposing papers, the Court **GRANTS IN PART** and **DENIES IN PART** EHang's motion to dismiss **WITH LEAVE TO AMEND**.

I.     Background

This case is a putative securities class action on behalf of a class of all persons and entities who purchased or otherwise acquired the publicly-traded American Depository Shares of EHang between March 29, 2022 and November 6, 2023, both dates inclusive, and who were damaged thereby.  Dkt. # 41 ("*FAC*"), ¶ 1.  Plaintiff brings this lawsuit against EHang, as well as individuals who are present and former officers and directors of EHang ("Individual Defendants").  *Id.* ¶¶ 14–19.

Ehang, which is headquartered in China, develops and sells autonomous aerial vehicles ("AAVs").  *Id.* ¶ 14.  Initially, EHang focused on developing AAVs that were not designed to carry passengers.  *Id.* ¶ 24.  However, EHang began developing AAVs that would serve the passenger market and, in 2018, EHang delivered a two-seat

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                                   Date: March 26, 2025

Title        Damien Pujo v. EHang Holdings Limited *et al.*

passenger-grade AAV to a customer for testing. *Id.* ¶ 25. EHang's passenger model is called "EH216-S." *Id.* ¶ 26. In October 2023, the Civil Aviation Administration of China granted the EH216-S model an official certification permitting the model to be used to carry passengers. *Id.* The model allegedly has significant limitations (e.g., its maximum range is 18 to 22 miles, its maximum flight duration is 21 to 25 minutes, and it takes two hours to charge). *Id.* ¶ 27. Plaintiff's complaint explains that the EH216 series "has a limited core market" and because of this "demonstrably limited market, investors closely monitor[] EHang's claims about pre-orders." *Id.* ¶¶ 28–29.

EHang had a "backlog" of pre-orders, including the two pre-orders at issue in this case, which were the largest pre-orders in the backlog. *Id.* ¶ 32. First, EHang had a preorder for 100 EH216s from the Indonesian company Prestige Aviation ("Prestige"). *Id.* And second, EHang had a pre-order for 1,000 units from an American biotechnology company called United Therapeutics Corporation ("United"). *Id.* According to Plaintiff's complaint, these two pre-orders, from Prestige and United, made up approximately 85% of EHang's stated pre-order book (of 1,300+ units). *Id.*

The complaint asserts, however, that on November 7, 2023, "EHang's façade came tumbling down" when Hindenburg Research LLC ("Hindenburg") published a report titled, "EHang: Hollow Order Book and Fake Sales Make This China-Based eVTOL Company Last In Line For Takeoff" (the "Hindenburg Report").[1] *FAC* ¶ 7; Dkt. # 49, Ex. 27 ("*Report*"). The Hindenburg Report "reveal[ed] that the United [] pre-order had long been terminated, and that Prestige [] could not possibly have pre-ordered 100 AAVs." *FAC* ¶ 7. In alleging that EHang's statements about the two pre-orders were misrepresentations, EHang relies on the Hindenburg Report as well as an investigation undertaken by Plaintiff's counsel. *Id.* 1:1–14.

---

[1] EHang asks the Court to take judicial notice of the Hindenburg Report. *See* Dkt. # 51 ("*RJN*"), 5:21–24. Plaintiff repeatedly references the Hindenburg Report in the complaint. *See, e.g.*, *id.* ¶ 7 ("[O]n November 7, 2023, before market open, the investment research firm Hindenburg Research LLC published a report . . . ."). Thus, it is properly incorporated by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court denies as moot EHang's other requests for judicial notice because, at this time, they have no bearing on the Court's ruling. *See generally RJN*; Dkt. # 57.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title   Damien Pujo v. EHang Holdings Limited *et al.*

As to the Prestige pre-order, Plaintiff's complaint alleges that although Prestige did place a pre-order, the order was "nowhere close to 100 units" and cites to a confidential witness, Former Employee 1 ("FE1"), who reports the order "was about a dozen units." *Id.* ¶ 40.  Plaintiff's complaint also asserts that "[i]t is implausible" that Prestige (as well as Rudy Salim, Prestige's founder and chairman) had the financial means to buy $41 million of EHang's AAVs because Prestige had "no track history," only had registered capital of $32,000 USD at current exchange rates, and Rudy Salim, a social media influencer and car dealership owner, owned 99% of Prestige's shares. *Id.* ¶¶ 41–47 ("Salim has no background in aviation.  Instead, he owns an Indonesian car dealership . . . . Salim is best known as a social media influencer . . . . Salim's social media stunts include, among other things, pretending to own a private jet by photoshopping Prestige Aviation's logo on it.").

As to the pre-order by United, Plaintiff states that in 2016, EHang "struck a deal with United," and indicated in a press release that United would be willing to buy up to 1,000 EHang AAVs over a 15-year period.  *Id.* ¶¶ 48, 51.  In its 2021 annual report on form 20-F, EHang again stated that "[EHang] may sell 1,000 units of customized AAVs with the organ transport e-helicopter system . . . according to a 15-year deliver schedule subject to subsequent purchase amendments."  *Id.* ¶ 52.  EHang noted in the annual report that "[p]urchase orders are conditional on [EHang] achieving a number of performance milestones and [United] obtaining required approvals from the FAA and FDA for the internal testing of the AAVs."  *Id.*  EHang made a "substantially similar statement" in its 20-F report in 2022. *Id.* ¶ 52, n.3.  EHang also had a slide in its Q3 2022 earnings presentation, stating EHang had "1,200+ units of passenger-grade AAVs in unfulfilled pre-order book," which encompassed the 1,000 units from United. *Id.* ¶ 53.  Plaintiff's complaint alleges that "these pre-orders are not mere expressions of interest.  Rather, [EHang] reported that if the conditions precedent to the order are satisfied, then the customer is obligated to purchase the AAVs." *Id.* ¶ 54.  As a result, "the United pre-order represented a backlog that would take years to fulfill and earn EHang . . . about $400 million."  *Id.* ¶ 55.

However, Plaintiff contends that the United pre-order had "fallen apart" by March 29, 2022. *Id.* ¶ 56.  Plaintiff points to a confidential witness, Former Employee 2 ("FE2"), who alleges that EHang employees were originally traveling to North America to meet with United and conduct flight demonstrates, but in 2022 and 2023, no EHang employees traveled to meet with United. *Id.* ¶ 60.  Plaintiff's complaint alleges that FE2's account "is corroborated by the Hindenburg Report" and United's own statements.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                          Date: March 26, 2025

Title      Damien Pujo v. EHang Holdings Limited *et al.*

*Id.* ¶ 61.  First, the Hindenburg Report quotes a former EHang employee as referring to the United deal as "dead—it's a dead end."  *Id.* ¶ 62.  Second, United's founder explained in 2020 that EHang was just one of three companies United had selected to develop AAVs.  *Id.* ¶¶ 63–64 ("[W]e want to give equal chance to anyone [who] is serious in the business to succeed.").  Third, EHang was "nowhere near meeting United's requirements," including that United needed AAVs that could fly 250 miles (while EHang's AAVs could only reach 19 miles).  *Id.* ¶ 66.  Fourth, United has not mentioned EHang since November 2021.  *Id.* ¶ 67.  And fifth, in May 2024, United disclosed it was pivoting away from electric-powered AAVs and instead, in 2022, had begun focusing on hydrogen-powered AAVs.  *Id.*  Based on these allegations, Plaintiff concludes:  "EHang ha[s] been out of the running with United . . . since 2022 at the very latest."  *Id.*

Based on these allegations, Plaintiff brought this lawsuit on December 4, 2023, for violations of the Securities Exchange Act of 1934 ("Exchange Act"), including Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC").  Dkt. # 1.  On October 14, 2024, Plaintiff amended the complaint.  *FAC.*  On December 7, 2024, EHang filed this motion to dismiss.  *Mot.*

II.    Legal Standard

       A.    Federal Rule of Civil Procedure 12(b)(6)

       To survive a Federal Rule of Civil Procedure 12(b)(6) motion, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff.  *See Turner v. City & Cnty. of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  The court then determines whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  However, a cause of action's elements that are "supported by mere conclusory statements, do not suffice."  *Id.*  Accordingly, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                              Date: March 26, 2025

Title      Damien Pujo v. EHang Holdings Limited *et al.*


B.      Federal Rule of Civil Procedure 9(b) and PSLRA

"Securities fraud complaints face heightened pleading requirements." *In re Nektar Therapeutics Secs. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022).  "At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 [of the Exchange Act] must satisfy the dual pleading requirements" of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *Id.* (citation omitted).

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  To plead fraud with particularity, the pleader must state the false representations' time, place, and specific content.  *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007).  The allegations "must set forth more than neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about the statement, and why it is false."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).  In essence, the defendant must be able to adequately answer the fraud allegations.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  "By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful."  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (emphasis in original).

C.      Section 10(b) and Rule 10b-5 of the Exchange Act

Plaintiff brings claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *FAC* ¶¶ 138–47.  Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                     Date: March 26, 2025

Title      Damien Pujo v. EHang Holdings Limited *et al.*

protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 implements Section 10(b) by making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

III.    Discussion

   A.    The Hindenburg Report

   EHang's motion to dismiss argues that Plaintiff cannot rely on the Hindenburg Report because it is unreliable, "pure speculation and unsupported innuendo." *Mot.* 12:3–13:24 ("The [complaint] is fatally flawed because it relies on an uncorroborated and unreliable short-seller report and unreliable [confidential witnesses] to plead falsity."). EHang also argues that Plaintiff's complaint "does not corroborate the Hindenburg Report." *Id.* 12:20.

   The Ninth Circuit has noted that self-interested and anonymous short-sellers have "a financial incentive to convince others to sell." *Nektar*, 34 F.4th at 840 (citation omitted). And courts have "detail[ed] reasons why allegations based on short seller reports should be viewed with caution." *Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 381 (S.D.N.Y. 2024) (noting the concerns with short-seller reports but ultimately determining the short-seller report at issue "ha[d] sufficient indicia of reliability to support the Lead Plaintiff's claims regarding the accuracy of the statements made by [defendant]").

   Nonetheless, courts have determined that "a securities fraud complaint is not automatically doomed just because it relies primarily or exclusively on a short-seller report quoting anonymous sources." *Uniformed Sanitationmen's Assoc. Comp. Accrual Fund v. Equinix, Inc.*, No. 24-cv-02656-VC, 2025 WL 39936, at *4 (N.D. Cal. Jan. 6, 2025); *Ng v. Berkeley Lights, Inc.*, No. 21-cv-09497-HSG, 2024 WL 695699, at *5 (N.D. Cal. Feb. 20, 2024) ("Despite Defendants' suggestion otherwise, the Ninth Circuit has not held that short-seller reports are per se unreliable."); *In re Mullen Auto. Sec. Litig.*, No. CV 22-3026-DMG (AGRx), 2023 WL 8125447, at *8 (C.D. Cal. Sept. 28, 2023) ("[I]t is not *per se* improper for a short-seller report to be incorporated into and form the basis of a securities class action complaint's allegations regarding falsity. Disputes about the reliability of the Hindenburg Report are factual disputes to be resolved at a later stage." (citations omitted)); *Diaz v. Northern Dynasty Minerals Ltd.*, No. 17-CV-1241 PSG (SS),

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title      Damien Pujo v. EHang Holdings Limited *et al.*

2018 WL 5099749, at *7 (C.D. Cal. Apr. 30, 2018) (noting courts have "held that
anonymous short-seller reports *can be* sufficient to establish falsity, when the information
revealed is publicly available and verifiable" (emphasis in original)); *Saskatchewan*, 718
F. Supp. at 381–82 ("Judge Engelmayer's note of caution regarding short seller reports . .
. is warranted.  But the opinion should not be misread as stating a rule that short seller
reports are to be disregarded' . . . . '[t]here is no rule categorically excluding allegations
derived from such sources.'" (citations omitted)).  In the context of falsity, courts have at
times found it "permissible for Plaintiffs to rely on a short-seller report . . . at the pleading
stage." *In re Banc of Cal. Secs. Litig.*, No. 17-00118 AG (DFMx), 2017 WL 3972456, at
*7 (C.D. Cal. Sept. 6, 2017) (citation omitted).

In other words, this Court rejects EHang's argument to the extent it attempts to
generalize that Plaintiff's complaint is fatally flawed because it relies on the Hindenburg
Report.  Instead of making a blanket determination on the Hindenburg Report, the Court
will analyze the Hindenburg Report on an element-by-element, and allegation-by-
allegation, basis. *See Ng*, 2024 WL 695699, at *5 (analyzing a short-seller report "under
the umbrella of [information provided by] confidential witnesses . . . . where a securities
plaintiff relies on an opinion, including one presented in a short-seller's report, such
factual allegations are subject to the same standard applied to evaluate facts alleged to
have originated with any confidential informant (or other witness)" (citations and
quotation marks omitted)).

B.      The Challenged Statements

Plaintiff alleges that EHang made two fraudulent statements:  (1) EHang and the
Individual Defendants stated that Prestige placed a pre-order of 100 EH216s, when the
true size of Prestige's pre-order is closer to a dozen EH216s, and (2) EHang and the
Individual Defendants stated that EHang had an active pre-order of 1,000 units from
United when that pre-order had already been terminated. *See FAC* ¶¶ 4–6; *Opp.* 8:18–20,
10:12–16, 13:6–11.

"To plead a claim under § 10(b) and Rule 10b-5, a plaintiff must allege '(1) a
material misrepresentation or omission ["falsity"]; (2) scienter; (3) connection between
the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5)
economic loss; and (6) loss causation.'" *Nektar*, 34 F.4th at 835 (citation omitted).
"Each of these elements must be independently satisfied." *Id.* (citation omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title     Damien Pujo v. EHang Holdings Limited *et al.*

    EHang argues that for both the Prestige pre-order statement and the United pre-order statement, Plaintiff failed to sufficiently plead falsity, scienter, and loss causation. *See generally Mot.*; *Reply*. The Court addresses each element in turn.

       *i.*     *Falsity*

    "A statement is false or misleading if it 'directly contradict[s] what the defendant knew at that time' or 'omits material information.'" *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (citation omitted). "In determining whether a statement is misleading, the court applies the objective standard of a 'reasonable investor.'" *Id.* (citation omitted). "When defendants 'tout positive information to the market,' they must 'do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'" *Id.* (citation omitted). "However, '[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (citation omitted).

       *a.*     *Prestige Pre-Order Statement*

    According to Plaintiff's complaint, EHang told investors that Prestige had placed a pre-order of 100 EH216s—even though Prestige had only placed a pre-order for approximately a dozen EH216s. *FAC* ¶ 6. To establish falsity, Plaintiff's complaint relies on various sources, including the Hindenburg Report, Plaintiff's confidential witness (FE1), and public data about Prestige.

    Because the Hindenburg Report was written by Hindenburg, and not a specifically named author, it falls under the umbrella of information provided by a confidential witness. *See e.g., Ng*, 2024 WL 695699, at *5; *Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *4 (C.D. Cal. Nov. 5, 2021). Courts have applied the same standard to a short-seller's allegations as allegations originating from any other confidential informant or witness. *See Ng*, 2024 WL 695699, at *5; *Hershewe*, 2021 WL 6536670, at *4. "In the Ninth Circuit, a plaintiff must describe a confidential witness with 'sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and provide 'adequate corroborating details.'" *Hershewe*, 2021 WL 6536670, at *4 (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                        Date: March 26, 2025

Title      Damien Pujo v. EHang Holdings Limited *et al.*

Here, however, Plaintiff's complaint does not merely rely on statements in the Hindenburg Report. Instead, Plaintiff's complaint supports the Hindenburg Report with statements from Plaintiff's own confidential witness, FE1. *FAC* ¶¶ 37–40. FE1 "was a flight test engineer working out of EHang's Guangzhou office from April 2020 through May 2023." *Id.* ¶ 37. FE1 reported to Xiong Qiping, the Department Manager. *Id.* FE1 maintained responsibilities that included supporting EHang's non-Chinese customers, specifically EHang's customers in Indonesia and Japan. *Id.* ¶ 38. FE1 was also involved in demonstrations of the EH216 units for the Indonesia and Japan markets. *Id.* Prestige was one of the customers that FE1 supported in Indonesia. *Id.* ¶ 36. Prestige intended to use EHang's AAVs for aerial transportation between Indonesia's many islands. *Id.* ¶ 36. On behalf of EHang, FE1 traveled to Indonesia to conduct flight demonstration, testing, and training for Prestige. *Id.* ¶ 39. FE1 reports that although Prestige did place a pre-order with EHang, the pre-order was for approximately a dozen units—nowhere close to 100 units. *Id.* ¶ 40. Plaintiff's complaint states that FE1 has knowledge of the total number of units Prestige ordered because FE1's responsibilities in Indonesia included coordinating with EHang's sales team to negotiate the agreements with Prestige. *Id.*

Here, the Court finds Plaintiff's complaint describes FE1 with sufficient particularity—Plaintiff's complaint provides FE1's job title, responsibilities, timeframe of work with EHang, and explanation for the witnesses' personal knowledge of fraud.

EHang argues that FE1 is "unreliable as a matter of law" because the former employee had "***no role*** in sales." *Reply* 3:10–15 (emphasis in original). EHang similarly forwards that FE1 does not claim to have had a role regarding the pre-order agreements and therefore must have relied on hearsay from unknown third parties in the sales department. *Id.*; *Mot.* 14:23–25. But Plaintiff's complaint specifies that FE1 did have a role in sales and did have a role regarding the preorder agreements, specifically FE1 was supporting Prestige and "FE 1's responsibilities in Indonesia [] included coordinating with EHang's sales team to negotiate the agreements with Prestige." *FAC* ¶¶ 38, 40. This allegation indicates that FE1—who was on the ground in Indonesia, worked directly with Prestige (including conducting training for Prestige), and was involved with negotiations with Prestige—was in a position to personally know the actual amount of units that Prestige pre-ordered.[2] *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982,

---

[2] Even if FE1 were to have learned information about the pre-order from a sales department colleague, the Court would still find FE1's statement to be sufficiently

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title       Damien Pujo v. EHang Holdings Limited _et al._

985 (9th Cir. 2008) ("Defendants quibble that these [confidential] witnesses weren't in a position to see the stop-work orders first-hand because they were 'engineers or technical editors' rather than managers. But any number of company employees would be in a position to infer the issuance of stop-work orders, which would have had the very obvious effect of putting numerous employees out of work.").

Moreover, FE1's statements are bolstered by additional allegations in the complaint regarding Prestige and its founder, Rudy Salim. The complaint alleges that Prestige could not have realistically pre-ordered $41 million worth of EHang's AAVs because Prestige only "had registered capital of . . . approximately $32,000 USD," Salim owned 99% of Prestige's shares, Salim was a social media influencer and car dealership owner with no background in aviation, Salim announced the EHang partnership only one day after forming Prestige, and Prestige's headquarters were located at the same address as Salim's car dealership. _See FAC_ ¶¶ 43–47. Although the Court agrees with EHang that these allegations about Prestige alone do not allow for the conclusion that Prestige is a sham company, the allegations do bolster FE1's and the Hindenburg Report's determination that any pre-order by Prestige was for fewer than 100 units.

Given the Hindenburg Report, FE1's statements, and the allegations regarding Prestige and its founder, the Court concludes that Plaintiff has sufficiently met the falsity element for the statement regarding the Prestige pre-order.

_b._       _United Pre-Order Statement_

United is a biotech company with a line of business that offers goods and services to address the chronic shortage of human organs for transplant. _Id._ ¶ 50. In furtherance of this endeavor, in the mid-2010s, United developed a business plan to use AAVs to more quickly transport human organs to be used immediately in surgery. _Id._ In 2016, United agreed to purchase 1,000 AAVs from EHang on the condition that EHang successfully developed an AAV suitable for United's organ transplant business and

---

reliable, plausible, and coherent, based on FE1's job position, job responsibilities, direct interaction with Prestige, location on the ground in Indonesia, and general explanation regarding personal knowledge. _See Zucco Partners, LLC v. Digimarc Corp._, 552 F.3d 981, 997, n.4 (9th Cir. 2009) (explaining that a hearsay statement is "not automatically precluded" but may simply indicate that the report "is not sufficiently reliable, plausible, or coherent").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title       Damien Pujo v. EHang Holdings Limited *et al.*

obtained necessary regularly approvals.  *Id.* ¶¶ 48–54.  "EHang reported that if the conditions precedent to the order [were] satisfied, then the customer [wa]s obligated to purchase the AAVs."  *Id.* ¶ 54.  Plaintiff's complaint asserts that EHang "continued to tout United's 1000 unit pre-order and maintain[ed] that it was still in effect" by the start of the class period, even though, in reality, "United had terminated [its] pre-order."  *Id.*  The complaint rests this conclusion on various allegations:

- **Hindenburg's Confidential Witness**.  A former EHang employee told Hindenburg that the United deal is "dead—it's a dead end."  *Id.* ¶ 62.  The former employee also told the research group:  "[F]or [EHang], it's a catchy idea, you know, to transport organs and liver, [or] heart, whatever, and say we're going to save lives.  For them it was an ice breaker or promotion, marketing.  Then these things failed, they lose their power, and what they don't do in China is take it out from the videos or the article[s] in their web[site] because they think that taking it out is like admitting it failed."  *Id.*

- **Statements from FE2**.  FE2 is a former employee of EHang, who worked out of EHang's Guangzhou office from June 2021 to October 2023.  *Id.* ¶ 57.  While working for EHang, FE2 "was responsible for various tasks related to flight testing, including executing flight tests, collecting data from flight tests, preparing summaries and feedback[] from flight tests, etc."  *Id.* ¶ 58.  According to FE2, EHang did not have a team interfacing with United, nor did United have any staff visit EHang's offices during FE2's tenure at EHang.  *Id.* ¶ 59.  "Early during FE2's tenure, EHang employees traveled to North America to meet with United [] and conduct flight demonstrations.  However, the visits quickly stopped occurring.  According to FE 2, no EHang employees traveled to meet with United [] in either 2022 or 2023."  *Id.* ¶ 60.

- **United's Statements**.  In December 2020, United's founder stated that EHang was just one of three companies that United had selected to develop AAVs to support its business model.  *Id.* ¶ 63.  The founder labeled partnerships with AAV companies like EHang as "shots on goal."  *Id.*  In November 2021, a United employee in a magazine article stated that United was "tech agnostic" between EHang and the two other AAV companies:  "If we believe that certain technology could help further the business of serving more patients in the future, we want to give equal change to anyone [who] is serious in the business to succeed[.]"  *Id.* ¶ 64

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title  Damien Pujo v. EHang Holdings Limited *et al.*

(emphasis omitted).  United has not publicly mentioned EHang since November 2021.  *Id.* ¶ 67.  And in May 2024, United disclosed it was pivoting away from electric-powered AAVs and instead has been working on hydrogen-powered AAVs since October 2022.  *Id.*

- **United's Expectations**.  Plaintiff's complaint alleges that, "EHang was nowhere near meeting United's requirements."  *Id.* ¶ 66.  United's founder has stated that United needs AAVs flying up to 290 miles, but EHang's models only have a reach of about 19 miles.  *Id.*

    The Court first analyzes Hindenburg's confidential witness.  The Hindenburg Report cites to an individual who allegedly labeled the United deal to be "dead."  *Report* 15–16.  However, the Hindenburg Report merely describes the individual as "a former EHang employee."  *Id.*  The confidential source is "not described with any identifying information and do[es] not disclose their own sources; Plaintiff provides no 'adequate basis for determining that the witness[] in question ha[d] personal knowledge of the events they report.'"  *Diaz*, 2018 WL 5099749, at *7 (quoting *Zucco*, 552 F.3d at 995).  Neither Plaintiff's complaint nor the Hindenburg Report gives any specificity as far as the witness's job title, involvement with United, or involvement with EHang's pre-orders.  This level of generality does not suffice.  *See Ng*, 2024 WL 695699, at *9 ("However, the [complaint] relies on the self-interested short-seller's *own* assertions that the characterizations passed on by the witnesses were credible.  Importantly, the allegations in the [complaint] (like those in the [short-seller report] itself) include no particularized details about these former employees' job titles or period of employment, nor do they provide details establishing that any of the witnesses had routine interactions with the [product at issue] or firsthand knowledge of the facts contradicting [defendant]'s executives' public statements . . . . To be credited as reliable, a witness must be in a position to personally know the information alleged." (citations omitted)).

    Next, the Court evaluates the statements from the confidential witness FE2.  The complaint explains that FE2 believed EHang did not have a team interfacing with United and that visits from United's staff had not occur in 2022 and 2023.  *FAC* ¶¶ 59–60.  However, these statements from FE2 do not demonstrate that the deal negotiated between United and EHang had entirely fallen apart.  The statements do not, for example, establish that FE2 knew the United pre-order had been rescinded.  Even if FE2 had specified that United had rescinded the pre-order (which is not the case), the complaint does not provide information about how FE2 may have had personal knowledge of that fact.  The mere allegation that FE2 did not know of any in-person meetings between

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title    Damien Pujo v. EHang Holdings Limited *et al.*

United and EHang does not result in the conclusion that EHang must have lost its largest pre-order.

Similarly, United's public statements do not clarify whether the pre-order was entirely void. At most, United's statements about focusing on hydrogen AAVs, rather than electric, demonstrate that United's interest in EHang might have decreased—but the statements do not establish that United had terminated its pre-order with EHang. And as to the indicators in the Hindenburg Report that EHang's AAV models were not meeting United's expectations, that allegation too does not establish that EHang could never meet United's expectations, or that the deal between EHang and United had been terminated. In fact, it was likely for this reason that EHang mentioned the risk of pre-orders in various public statements: "Pre-orders do not obligate the customers to purchase EHang's AAVs unless certain conditions are satisfied. Fulfilment is expected to take several years and is conditional upon, among other things, achievement of performance milestones and receipt of regulatory approvals." *See, e.g.*, *id.* ¶ 68 (providing text from EHang's March 29, 2022 press release).

Accordingly, the Court determines Plaintiff has not sufficiently alleged the required falsity element as to the United pre-order statement.

    *ii.    Scienter*

Plaintiff advances four arguments in support of scienter. First, Plaintiff describes that the Prestige and United pre-orders were both of "paramount importance to EHang," and thus "it would be absurd to suggest that the Individual Defendants (the CEO, CFO, and COO of EHang) were unaware that United had terminated its pre-order, or did not know the true size of Prestige's pre-order." *Opp.* 14:14–15, 15:1–6. Second, the Individual Defendants repeatedly commented on the specifics of the pre-orders. *See FAC* ¶¶ 77–78, 82–83. Third, in a November 2023 Investor Presentation (shortly after the Hindenburg Report was published), EHang stopped claiming it had pre-orders of 1,200+ AAVs. *Opp.* 16:6–8. And fourth, Plaintiffs point to the Hindenburg Report's analysis of another alleged deal (this time with Heli-Eastern) that a former employee labeled as "dead," to assert that EHang has "a pattern of continuing to present terminated agreements." *Id.* 17:3–12.

"'Scienter' as used in the federal securities laws means the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.'"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title       Damien Pujo v. EHang Holdings Limited *et al.*

*Glazer*, 63 F.4th at 765 (citation omitted).  "Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud." *Id.* (citation omitted); *Zucco*, 552 F.3d at 991 ("[A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness." (emphasis in original)).  "Rather, deliberate recklessness is an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it."  *Glazer*, 63 F.4th at 765 (quotation marks and citation omitted).  "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intention or conscious misconduct."  *Id.* (citation omitted).  Although the Ninth Circuit has "developed a set of rules to analyze different types of scienter allegations," it has noted that courts "must also view the allegations as a whole."  *Zucco*, 552 F.3d at 991–92.  Thus, courts "conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness."  *Id.* at 992.

Even if plaintiffs do not allege particular facts that high-level managers "actually knew" about an alleged false statement, plaintiffs may "*infer* that these high-level managers must have known . . . because of the[] devastating effect on the corporation's revenue."  *Berson*, 527 F.3d at 987 (emphasis in original).  For example, in *Berson*, the Ninth Circuit determined it would be "hard to believe" that a company's CEO and CFO "would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work."  *Id.* at 987, n.5 ("The first stop-work order halted between $10 and $15 million of work on the company's largest contract with one of its most important customers.  The size of the contract and the prominence of the client raise a strong inference that defendants would be aware of this order.").

The Ninth Circuit approved a similar inference in *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003).  In *America West*, plaintiffs did not plead particular facts showing certain defendants knew about the company's maintenance problems or the government investigation of those problems.  *Id.* at 943.  Instead, plaintiffs relied on, and the Ninth Circuit approved, the following inference:  The company's maintenance problems, and the related government investigation, were so paramount to the company that "it [was]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:23-cv-10165 MWC (DFMx)                          Date: March 26, 2025

Title    Damien Pujo v. EHang Holdings Limited *et al.*

absurd to suggest that the Board of Directors would not discuss" them.  *Id.* at 943, n.21; *see Berson*, 527 F.3d at 987–88 (summarizing and applying *America West*).

### a.    Prestige Pre-Order Statement

Here, the Court agrees with Plaintiff that it would be absurd to suggest that EHang's executives did not know that Prestige's pre-order was only 12% of the size they had been disclosing to the public.  As a preliminary matter, Plaintiff's complaint explains, in detail, how crucial EHang's pre-order book is to EHang's business:  "Headquartered in Guangzhou, China, EHang makes [AAVs], but its model's limited range and flight time drastically limit its potential market.  So EHang sold itself to investors on the strength of its . . . pre-order book.  With EHang's backlog of pre-orders ostensibly covering several years' worth of production, EHang drastically reduced its risk profile for investors — because they did not have to worry about the demand (or lack thereof) for EHang's AAVs."  *FAC* ¶¶ 2–3.  Moreover, according to Plaintiff's allegations, Prestige's pre-order was no ordinary pre-order.  In fact, the Prestige pre-order was EHang's largest pre-order in Asia—"a market of growing importance and focus" for EHang, a Chinese company.  *Opp.* 14:18–20; *FAC* ¶¶ 34, 82 ("[W]e received a preorder for 100 units of EHang 216 AAVs from Indonesian aviation company, Prestige Aviation, which is the largest preorder we have received in Asia so far . . . . [W]e have obtained preorders of up to 210 units from customers in Japan, Malaysia, and Indonesia since the beginning of this year, and we see the trend of further expansion in Southeast Asian markets.").  EHang now attempts to downplay the importance of the Prestige pre-order.  *See Mot.* 8:5–6 ("Plaintiff cannot plead scienter by claiming the [United] and Prestige preorders were important.").  But a slide accompanying a Q2 2022 Earnings Call only featured the logo of five companies in the context of showcasing the company's "pre-order book"—and Prestige was first on the list.  *FAC* ¶¶ 82–87.  Moreover, during the class period, EHang represented to investors that its total number of pre-orders was 1,200+ AAVs.  *See id.*  If the Prestige pre-order was truly for 100 units, then Prestige's pre-order alone would have made up approximately 8% of the pre-order book.  *See Opp.* 14:14–18.  However, if the pre-order was for only 12 units, then the Prestige pre-order would have made up less than 1% of the pre-order book.  *See id.*

On a final note, the difference in cost between 12 AAVs and 100 AAVs is significant.  The Prestige pre-order was for EH216-S units, which are offered for approximately $410,000 outside of China (RMB 2.39 million domestically).  *FAC* ¶ 42.  Accordingly, a dozen units would cost less than $5 million, whereas 100 units would cost

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title    Damien Pujo v. EHang Holdings Limited *et al.*

approximately $41 million.  Based on all of these allegations, it is hard to imagine that executives at EHang would not know that their supposed largest pre-order in the Asian market had been made, not for 100 units, but rather for only a dozen.

For these reasons, the Court finds that Plaintiff has sufficiently met the scienter requirement with regard to the Prestige pre-order statement.

> b.    *United Pre-Order Statement*

Because the Court determined above that Plaintiff fails to sufficiently plead falsity as to the United pre-order statement, the Court need not reach EHang's scienter argument.  Nonetheless, the Court will address it for purposes of leave to amend.

Similar to the analysis for scienter with regard to the Prestige pre-order, the Court finds it unreasonable that top executives at EHang would not know that their *largest* pre-order, which allegedly made up over 80% of EHang's pre-order book, had fallen through—especially given Plaintiff's allegations regarding how crucial pre-orders are to the EHang business model.

Accordingly, the Court finds Plaintiff can sufficiently demonstrate scienter as to the United pre-order statement.

> iii.    *Loss Causation*

To establish loss causation, Plaintiff's complaint alleges that "on November 7, 2023 before market opened, the investment research firm Hindenburg Research LLC published" the Hindenburg Report, which asserted that EHang's pre-order book was fraudulent.  *Id.* ¶¶ 7–8.  Plaintiff's complaint states that the publication of the Hindenburg Report "shocked the market" and EHang's stock price declined by 12.7%, or $1.90 per ADS, to close at $13.06 on the same day.  *Id.* ¶ 8.  In opposition to EHang's motion to dismiss, Plaintiff also asserts that courts have observed that loss causation is a matter of proof at trial, not a motion to dismiss.  *Opp.* 19:4–7.

EHang argues that Plaintiff has failed to sufficiently plead loss causation because "[t]he Ninth Circuit and other courts have held that a short-seller's negative and uncorroborated characterization of a company's business and technology is not perceived by investors as truth, and thus as a matter of law, such a short report cannot be cast as a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title     Damien Pujo v. EHang Holdings Limited *et al.*

'corrective disclosure.'" *Mot.* 3:5–9. EHang also argues that its "stock price recovered entirely within seven trading days of the Hindenburg Report's publication and [EHang's stock price] ultimately closed the year 12% above its price just before the [Hindenburg] Report's release." *Reply* 12:5–12.

    "Even when deceptive conduct is properly pleaded, a securities fraud complaint must also adequately plead 'loss causation.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). The Ninth Circuit has referred to the "loss causation prong" as "simply a variant of proximate cause." *Espy v. J2 Global, Inc.*, 99 F.4th 527, 540 (9th Cir. 2024) (citation omitted). "[T]he ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210 ("Loss causation is shorthand for the requirement that 'investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss.'"(citation omitted)). "This proof is often made by identifying one or more corrective disclosures, which occur when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Espy*, 99 F.4th at 540 (citation omitted); *Lloyd*, 811 F.3d at 1210 ("The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" (citation omitted)). "[Plaintiff] must allege with particularity facts 'plausibly suggesting' that 'a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatement,' and that disclosure 'caused the company's stock price to decline.'" *Espy*, 99 F.4th at 540 (citations omitted). "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Lloyd*, 811 F.3d at 1210 (citation omitted).

    The Ninth Circuit has noted that "[w]hen applied to allegations of loss causation . . . Rule 9(b)'s particularity requirement usually adds little to the plaintiff's burden." *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). "The plaintiff must plausibly allege a causal connection between the defendant's misstatements and the plaintiff's economic loss, and to succeed in doing so the plaintiff will always need to provide enough factual content to give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). The Ninth Circuit has noted that the effort "should not prove burdensome" because "under Rule 9(b) the plaintiff's allegations will suffice so

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title   Damien Pujo v. EHang Holdings Limited *et al.*

long as they give the defendant 'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact.'" *Id.* (citation omitted).

"To rely on a corrective disclosure that is based on publicly available information, a plaintiff must plead with particularity facts plausibly explaining why the information was not yet reflected in the company's stock price." *Bofl*, 977 F.3d at 794. Plaintiffs may "allege particular facts plausibly suggesting that other market participants *had not* done the same analysis, rather than 'could not.' If other market participants had not done the same analysis, then it is plausible that the blog posts disclosed new information that the market had not yet incorporated into [defendant]'s stock price." *Id.* Some information, even if it is "nominally available to the public, can still be 'new' if the market has not previously understood its significance." *Id.*

Specifically, the Ninth Circuit has addressed the standard in the context of cases when plaintiffs identify a short-seller report, like the Hindenburg Report, as the proposed corrective disclosure (like here). "Because . . . Hindenburg rel[ies] on public information to compile [its] reports," the Ninth Circuit has determined that whether the report "'revealed . . . the truth concealed by the defendant's misstatements' is an open question." *Espy*, 99 F.4th at 540 (quoting *Bofl*, 977 F.3d at 791). While "[a] disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure," the inquiry is whether, "[b]ased on [plaintiff's] particularized allegations, can we plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price?" *Id.* at 540–41 (citation omitted). "To allege that a disclosure provided 'new information,' [plaintiff] must allege 'particular facts plausibly suggesting that other market participants had not done the same analysis' as that done in the proposed corrective disclosure." *Id.* at 541 (citation omitted). To determine "whether a disclosure provided 'new information to the market,'" the Ninth Circuit considers "a number of factors, including whether 'the underlying data was publicly available,' 'the complexity of the data and its relationship to the alleged misstatements,' and 'the great effort needed to locate and analyze' that information." *Id.* (citation omitted). The Ninth Circuit has noted that a Hindenburg report may at times be distinguished from "blog posts and reports held to be insufficient" because Hindenburg is a "well-known short-seller firm[] whose reports are not 'anonymous,'" like the blog posts in other cases that "had no associated contact information that would allow investors to verify the report's reliability." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:23-cv-10165 MWC (DFMx)                      Date: March 26, 2025

Title     Damien Pujo v. EHang Holdings Limited *et al.*

Nonetheless, in *Espy*, the Ninth Circuit still found that a report by Hindenburg "fail[ed] to qualify as a corrective disclosure" because "its analysis was based entirely on public information and required no 'expertise or specialized skills beyond what a typical market participant would possess.'" *Id.* (citation omitted).  In that case, "Hindenburg's analysis was based only on a careful reading of public documents, including [] investor presentations, press releases, employees' LinkedIn profiles, board members' resumes, public corporate records, and SEC filings" and the plaintiff provided "no facts plausibly explaining why this information . . . was not yet reflected in [plaintiff]'s stock price."  *Id.* (citation omitted).

Here, Plaintiff's complaint identifies a specific economic loss:  the drop in stock value on November 7, 2023, which followed the Hindenburg Report's publishing before the marked opened that same day.  *See FAC* ¶¶ 7–8.  The complaint also alleges the loss was caused by misrepresentations about the pre-order book.  *Id.*  The complaint explains that because EHang's AAVs' "limited range and flight time drastically limit its potential market," EHang "sold itself to investors on the strength of its 1,300+ unit pre-order book."  *Id.* ¶ 2.  Thus, when the "façade" of the pre-order book "came tumbling down" due to the Hindenburg Report's analysis, the "disclosure of EHang's fraud shocked the market."  *Id.* ¶¶ 7–8.

The Hindenburg Report in this case also showed that Hindenburg utilized expertise, time-consuming analysis, and new discoveries to reach its conclusion.  The Hindenburg Report states:  "After examining every preorder and partnership, itemized below, our research indicates that over 92% of EHang's preorder book is based on deals that were later 'abandoned' or came from customers in no financial position to purchase EHang's aircraft in volume, or at all."  *Report* 13.  To establish this pattern of fake pre-orders, Hindenburg scrutinized financial information of customers, interviewed a former EHang employee, contrasted details in early EHang presentations with details in later EHang presentations, analyzed SEC archives, contacted companies directly for comment (e.g., "multiple calls and emails" to different individuals at United, which resulted in the PR spokesman Elliot Sloane responding:  "You've called 20 people, and it's like, obsessive, and it's too much . . . ."), and tracked down and compared countless statements from EHang, EHang's customers, EHang's competitors, and EHang's customers' partners (e.g., presentation slides, interviews).  *See generally id.*

As to the Prestige pre-order specifically, Hindenburg investigated Prestige and determined that Prestige could not have made a pre-order from EHang for the touted 100

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title        Damien Pujo v. EHang Holdings Limited *et al.*

units, worth an estimated $30 million.  *Id.* 16–19.  Hindenburg based its conclusion about Prestige's pre-order on the following findings:

- Rudy Salim, Prestige's founder, owner, and CEO was a social media influencer with a car dealership, with no online footprint related to aviation. *Id.*
- Hindenburg "couldn't even find a website for Prestige Aviation." *Id.* 17.
- Salim himself had "no discernible aviation experience."  *Id.*
- On April 14, 2021, Salim incorporated Prestige for approximately $34,000 in registered capital.  *Id.* 19.  The "next day," Salim announced the partnership with EHang.  *Id.*
- Hindenburg researchers uncovered that Prestige (the alleged aviation company) was based out of an address that matched the address for Salim's car dealership.  *Id.*
- Hindenburg discovered potential deception from Prestige itself. Hindenburg researchers compared two Instagram posts and realized that, in one of them, a "Prestige" logo seemed to be Photoshopped on to a private jet; whereas, in the other post, with an identical-looking private jet, there was no "Prestige" logo.  *Id.* 18.

For example, in January 2021, one Instagram user, likely a Prestige employee or partner, posted a photo of himself stepping out of a Prestige Aviation Jet. [1] (https://www.instagram.com/p/CXwPkRhh0T3/?img_index=3) 2 (https://www.instagram.com/p/CX4PlzQK6qX/) 3 (https://www.jualo.com/u/kevin-setiawan-4))



(Source: Instagram
(https://www.instagram.com/p/CJtKGWlpQ4I/))

The same user posted a video (https://www.instagram.com/stories/highlights/17877085335751953) that same week on Instagram reels, featuring what looks to be the same exact jet, but without the Prestige Aviation name and logo photoshopped onto it. Instead, it featured the name of the real owner, Elang Indonesia (no relation to EHang).[12]



*Id.* (comparing the private jet posts using red arrows within the Hindenburg Report).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title     Damien Pujo v. EHang Holdings Limited *et al.*

As to United pre-order being terminated, the Hindenburg Report's underlying findings included, among other things:

- Statements from United's CEO about the company's expectations for AAVs.
- United "quietly dump[ing] its entire stake in EHang" in February 2021.
- The VP of United's Organ Delivery System stating during an interview that EHang was not offering an aircraft that met United's needs.
- A former EHang employee spoke to Hindenburg and revealed that the United pre-order was "dead."
- The former EHang employee also told Hindenburg that EHang had not removed several names from its investor presentations, despite EHang no longer working with those companies because it did not want to admit failure.
- Hindenburg attempted to contact numerous individuals at EHang and eventually received the following response from EHang's Public Relations spokesperson:  "You've called 20 people, and it's like, obsessive, and it's too much . . . You know, we have no comment . . . . So, I hope you can take that for an answer."

*Id.* 13–16.

Although the Court (and likely investors) treats the Hindenburg Report with caution, and the Court acknowledges that some of the information in the report may have already been part of the public marketplace, it would be a loophole for fraudsters if no claim could be made for fraud as long as it was Hindenburg that initially exposed the fraud.  Clearly, that is not the standard the Ninth Circuit has established.  Instead, to determine "whether a disclosure provided 'new information to the market,'" the Ninth Circuit considers "a number of factors, including whether 'the underlying data was publicly available,' 'the complexity of the data and its relationship to the alleged misstatements,' and 'the great effort needed to locate and analyze' that information."  *See Espy*, 99 F.4th at 540 (citation omitted).  Here, there is no doubt that some of Hindenburg's information was already publicly available.  For example, Hindenburg published publicly available data to show that in 2021, Prestige was originally incorporated for only $34,000 in registered capital.  *See Report* 19.  However, because

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                          Date: March 26, 2025

Title      Damien Pujo v. EHang Holdings Limited _et al._

there are numerous moving parts in a future-looking pre-order, a company's registered capital alone does not point to the impossibility of a pre-order (for example, as EHang has publicly explained: "[p]re-orders do not obligate the customers to purchase EHang's AAVs unless certain conditions are satisfied" and that "[f]ulfilment is expected to take several years . . . ."). _See FAC_ ¶ 77. The Hindenburg Report needed to expose potential fraud beyond mere citation to public information. At this motion to dismiss stage, the Court finds that it did. The Hindenburg Report provided new information to the market that investors plausibly could have accepted as true and that would have significantly rattled investors' confidence in EHang's 2023 pre-order book. Just in the context of Prestige, Hindenburg took great effort to locate and analyze information about Prestige, including scouring for information on Prestige, realizing the address for Prestige was headquartered out of a car dealership, and even discovering potential fake private jet branding by comparing Instagram photos. And in the context of just the United pre-order, Hindenburg spoke with, and quoted directly from, at least one former EHang employee.

For these reasons, the Court finds that Plaintiff may rely on the Hindenburg Report as a corrective disclosure because it reported on newly discovered information, made new connections between available information, and recounted information received from contacting individuals. _See Mullen_, 2023 WL 8125447, at *11 (allowing a Hindenburg report to establish loss causation: "[T]he [Hindenburg] Report includes more than readily available public information. For instance, the authors of the report recounted information they received from contacting [the CEO] . . . various former employees . . . and others . . . . Moreover, although the Report contains a disclaimer that the information is obtained from 'public sources we believe to be accurate and reliable,' this disclaimer is not tantamount to stating that all the information is available and known to investors already.").

EHang also argues that the Hindenburg Report cannot be a corrective disclosure because although EHang's stock price dropped the day of the Hindenburg Report, EHang's stock price "recovered entirely within seven trading days of the Hindenburg Report's publication and ultimately closed the year 12% above its price just before the Report's release." _Reply_ 12:5–8. EHang concludes "[i]t is thus reasonable to infer that the Report did not cause the stock price decline" and points to cases, including _Wochos_, where court have found no loss causation when a defendant's stock price quickly recovered. _Id._ 12:5–19.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:23-cv-10165 MWC (DFMx)                                    Date: March 26, 2025

Title       Damien Pujo v. EHang Holdings Limited *et al.*

In *Wochos*, Tesla's stock price closed at $356.88 on October 6, 2017. 985 F.3d 1180, 1198 (9th Cir. 2021). After market hours that day, a *Wall Street Journal* article disclosed an alleged misrepresentation that was the basis for the plaintiffs' claims. *Id.* By October 9, 2017, which was the next trading day, Tesla's stock price had fallen to $342.94. *Id.* However, "the stock price immediately rebounded, closing at $355.59 on October 10 and trading between $350 and $360 over the next week." *Id.* The Ninth Circuit determined that "[t]he quick and sustained price recovery after the modest October 9 drop refute[d] the inference that the alleged concealment of this particular fact caused any material drop in the stock price." *Id.*

The Court acknowledges that discovery will be needed to determine the true impact of the Hindenburg Report, given that EHang's stock price recovered within seven days of the report. Nonetheless, unlike the "modest" 3.9% stock drop in *Wochos* that almost entirely recovered the very next day, EHang's stock dropped by 12.7% and then took approximately one week to fully recover. Thus, at this motion to dismiss stage, the Court finds that EHang's significant decline in stock price—which followed the Hindenburg Report's publication by mere hours—indicates that the allegations in the Hindenburg Report plausibly caused the stock price decline.

Accordingly, the Court finds Plaintiff has established loss causation.

C.       Section 20(a)

Section 20(a) of the Exchange Act imposes liability on certain "controlling" individuals for violations of Section 10(b) and its underlying regulations. *Glazer*, 63 F.4th at 765 (citations omitted). "Section 20(a) claims are derivative." *Id.* (citation omitted). "A defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Id.* (citations omitted).

Here, EHang argues for dismissal of the Section 20(a) claim against the Individual Defendants because there is no viable Section 10(b) claim. *Mot.* 25:21–24. However, because the Court finds there is a viable Section 10(b) claim for the statement regarding the Prestige pre-order, the Court **DENIES** EHang's motion to dismiss as to the Section 20(a) claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.  2:23-cv-10165 MWC (DFMx)                    Date: March 26, 2025

Title     Damien Pujo v. EHang Holdings Limited *et al.*

### IV.    Leave to Amend

Whether to grant leave to amend rests in the sound discretion of the trial court. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). Courts consider whether leave to amend would cause undue delay or prejudice to the opposing party, and whether granting leave to amend would be futile. *See Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996). Generally, dismissal without leave to amend is improper "unless it is clear that the complaint could not be saved by any amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

Here, amendment is not futile, as Plaintiff could plead with more specificity the details surrounding the United pre-order; for example, Plaintiff could provide the basis for FE2's personal knowledge of the United pre-order and provide allegations demonstrating that the pre-order had in fact been terminated. The Court therefore **GRANTS** Plaintiff leave to amend its claims.

### V.    Conclusion

For the foregoing reasons, the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. The claim regarding the United pre-order is dismissed with leave to amend. Plaintiff's amended complaint shall be filed by **May 1, 2025**. EHang's response shall be filed within 21 days after the filing of the amended complaint.

**IT IS SO ORDERED.**

|                        |   :   |
|------------------------|-------|
| **Initials of Preparer** | TJ   |