Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Plaintiff and the Settlement Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZHAN KUI ZHANG, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> EHANG HOLDINGS LIMITED, HUAZHI HU, RICHARD JIAN LIU, and XIN FANG, <br><br> Defendants. | Case No: 2:23-cv-10165-MWC (DFMx) <br><br> <u>CLASS ACTION</u> <br><br> **DECLARATION OF YU SHI IN SUPPORT OF PLAINTIFF'S MOTIONS FOR: (1) FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, AND FINAL CERTIFICATION OF THE SETTLEMENT CLASS; (2) AWARD OF ATTORNEY'S FEES AND EXPENSES AND AWARD TO PLAINTIFF** |

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Declaration of Josephine Bravata Concerning: (A) Mailing/Emailing of Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections |
| 2 | Declaration of Lead Plaintiff Zhan Kui Zhang |
| 3 | The Rosen Law Firm, P.A.'s Firm Resume |
| 4 | Excerpts from Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review,* (NERA Economic Consulting, 2025) |
| 5 | Letter filed on August 9, 2022 in the action *Vanderhoef v. China Auto Logistics, Inc., et al*., No. 2:18-cv-10174-CCC-ESK (D.N.J.) as Dkt. 140. |
| 6 | Survey of Law Firm Billing Rates – Plaintiffs' and Defense Firms |
| 7 | Declaration of Paul Mulholland Concerning the Claims Administrator's Proposed Fees and Breakdown of "Reasonable and Necessary" Administrative Costs |

I, Yu Shi, declare the following, to the best of my knowledge, pursuant to 28 U.S.C. §1746.

1. I am a Partner at The Rosen Law Firm, P.A. ("Rosen"), Court-appointed Lead Counsel for Lead Plaintiff Zhan Kui Zhang ("Plaintiff") in the above-captioned Action.[1] I am an attorney duly licensed to practice law in the State of New York and admitted *pro hac vice* in this Action. I have personal knowledge of the matters set forth herein and, if called upon, I could and would completely testify thereto. Nothing in this Declaration shall be construed as a waiver, whether specific or general, of the attorney-client privilege or any other applicable privilege or doctrine.

2. I submit this declaration, together with the attached exhibits, in support of Plaintiff's Motions for: (I) Final Approval of Class Action Settlement, Plan of Allocation, and Final Certification of Settlement Class; and (II) an Award of Attorneys' Fees and Expenses and Award to Plaintiff. As set forth in the Memorandum of Law in Support of Plaintiff's Motion for Final Approval of Settlement, Plan of Allocation, and Final Certification of Settlement Class ("Final Approval Memorandum"), Plaintiff seeks final approval of the $1,985,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members, and final certification of the Settlement Class.

3. As set forth in the Memorandum of Points and Authorities in Support of the Motion for an Award of Attorneys' Fees and Expenses and Award to Plaintiff ("Fee Memorandum"), Lead Counsel seeks an award of attorneys' fees of 25% of the Settlement Fund, or $496,250, plus interest, reimbursement of counsel's out-of-pocket litigation expenses incurred in prosecuting this Action in the amount of $57,048.70,

---

[1] Unless otherwise indicated, all capitalized terms herein have the same meanings as set forth in the Stipulation of Settlement ("Stipulation," ECF No. 79), the Final Approval Memorandum, and the Fee Memorandum.

plus interest, and an award to Plaintiff of $2,500 pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for the time and effort he devoted to the representation of the Settlement Class.

4.      The purpose of this Declaration is to present certain pertinent facts that are not reflected in the documents filed in this case or other publicly available sources, and to provide evidentiary support for specific assertions contained in the Final Approval Memorandum and Fee Memorandum.

**The Litigation and Settlement Negotiations**

5.      Plaintiff Damien Pujo initiated this putative securities class action on December 4, 2023. (ECF No. 1).

6.      The Court appointed Zhang as Lead Plaintiff and approved his selection of Rosen as Lead Counsel on August 12, 2024. (ECF No. 33).

7.      Following the appointment of Lead Plaintiff and Lead Counsel, Plaintiff, through Lead Counsel, performed an extensive investigation of the factual allegations, including: (a) analyzing EHang's SEC filings, press releases, conference calls, and other public statements during the Settlement Class Period; (b) analyzing public documents, reports (including research reports by securities and financial analysts), announcements, and news articles regarding EHang; (c) analyzing public documents, foreign regulatory filings, news articles, online forums, and social media regarding United, Prestige,  and other purported customers of EHang identified in the Hindenburg Report, (d) retaining investigators to interview former EHang employees in China and United's employees in Canada;[2] (e) consulting with a damages expert.

8.      Following the investigation set forth above, Plaintiff filed the operative Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") on October 14, 2024 (ECF No. 41).

---

[2] Unither Bioelectronics (the United subsidiary in charge of the organ transportation program) is based in Quebec, Canada.

4

9. The parties then fully briefed EHang's motion to dismiss (ECF Nos. 47, 55-56). On March 26, 2025, the Court granted in part and denied in part EHang's motion to dismiss. (ECF No. 59). Specifically, the Court dismissed Plaintiff's claim concerning the United pre-order ("United Claim"), leaving Plaintiff's allegations concerning the Prestige pre-order ("Prestige Claim") as the sole remaining claim.

10. Defendants filed their Answers on June 6, 2025. (ECF No. 73). The Parties submitted their Joint Rule 26(f) Report on July 3, 2025. (ECF No. 76).

11. Because the damages in this case are relatively modest, Plaintiff determined that it was prudent to explore the possibility of an early resolution of the Action before incurring significant costs associated with cross-border discovery.

12. Accordingly, the Parties began discussing a potential mediation and the selection of a mutually agreeable mediator. The Parties ultimately agreed to attend a mediation with Robert A. Meyer of JAMS. Mr. Meyer is a respected mediator with substantial experience mediating complex securities class actions, including those involving China-based defendants.[3]

13. On July 1, 2025, the Parties participated in a full-day, in person mediation with Mr. Meyer in Los Angeles. Prior to the mediation, the Parties exchanged detailed confidential mediation statements and documentary evidence. Although this mediation session ended without a resolution, the Parties continued negotiations through Mr. Meyer. Eventually, on July 3, 2025, Mr. Meyer issued a double-blind "mediator's proposal" to settle this Action in principle, which the Parties accepted.

14. After the agreement in principle, the Parties negotiated the detailed terms of the Settlement and the various Settlement documentation, including the Stipulation and exhibits. On August 12, 2025, Plaintiff filed the Stipulation and moved for preliminary approval of the Settlement. (ECF Nos. 79-80).

---

[3] Mr. Meyer's biography is available at: https://www.jamsadr.com/meyer/.

15.    On September 17, 2025, the Court entered an Order granting Plaintiff's motion for preliminary approval of the Settlement ("Preliminary Approval Order") (ECF No. 83).

**Notice Procedures and Reaction of the Settlement Class Members**

16.    At Lead Counsel's direction, and pursuant to the Preliminary Approval Order, the Claims Administrator Strategic Claims Services ("SCS") published the Summary Notice electronically over *GlobeNewswire* on October 17, 2025. Exhibit 1, Bravata Decl. ¶11. SCS also posted the Notice of Pendency and Proposed Settlement of Class Action ("Long Notice"), Proof of Claim and Release Form ("Claim Form"), Stipulation, and Preliminary Approval Order on SCS' website on September 29, 2025. *Id*. ¶14.

17.    To disseminate individual notice, 42,824 notices (either via a mailed Postcard Notice or an emailed link to the Long Notice and Claim Form) were sent to potential Settlement Class Members. *Id*. ¶9.

18.    Objections to and requests for exclusion from the Settlement must be received by December 19, 2025. Neither Lead Counsel nor the Claims Administrator have received any objections to any aspect of the Settlement (including the requests for attorneys' fees, expenses, and award to Plaintiff) nor are there any objections on the Court's docket. Neither Lead Counsel nor the Claims Administrator have received any requests exclusion. *Id*., ¶¶14-15.

**Plan of Allocation**

19.    Pursuant to the Preliminary Approval Order, the Long Notice fully described the proposed Plan of Allocation. Bravata Decl., Ex. A (Long Notice) at 4-7. Lead Counsel created the proposed Plan of Allocation after consulting with a financial expert, designing it to reimburse Settlement Class Members in a fair and reasonable manner.

20.    If approved, the Plan of Allocation will govern the distribution of the Net Settlement Fund among Settlement Class Members who timely submit valid Claim

Forms. Under the Plan, the Claims Administrator will calculate each Authorized Claimant's pro rata share based on their Recognized Loss, which is determined by the timing and price of their purchases and sales of EHang ADSs. Each similarly situated Authorized Claimant will receive a proportional share of the Net Settlement Fund, calculated by the ratio of the claimant's allowed Recognized Loss to the total Recognized Losses of all Authorized Claimants.

21.    The Plan of Allocation is structured to equitably compensate Settlement Class Members for their losses, based on the timing of the alleged corrective disclosure and consistent with the loss causation principles articulated in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). The formula applies uniformly to all claimants, including Plaintiff, ensuring that no claimant receives preferential treatment.

22.    In my professional judgment, based on extensive experience prosecuting securities class actions, the Plan of Allocation provides a fair, reasonable, and rational method for distributing the Settlement Funds among Authorized Claimants. Moreover, there have been no objections to the Plan, further supporting its fairness and adequacy.

### The Fairness and Reasonableness of the Settlement

23.    The proposed Settlement is the culmination of careful and efficient litigation followed by arms' length settlement negotiations.

24.    During the course of this litigation, Plaintiff and Lead Counsel developed a thorough understanding of the claim at issue and the significant risks associated with continued litigation, including the possibility that the Settlement Class might ultimately recover nothing. Among other things, Lead Counsel:

> a. conducted extensive legal research and investigation into the factual allegations and Plaintiff's claim, which included: (a) hiring and overseeing investigators to locate and interview witnesses in China and Canada; (b) consulting with a damages expert to assess class damages; (c) reviewing EHang's SEC filings, press releases, earnings calls,

7

analyst reports, and news about EHang in both English and Chinese sources; (d) locating and reviewing public documents, news articles, and online forums concerning EHang's customers, including United, Prestige, and others identified in the Hindenburg Report;

b. drafted and filed initial complaint and the operative amended Complaint;

c. researched and briefed EHang's motion to dismiss;

d. analyzed Defendants' confidential mediation submissions, including documentary evidence submitted therewith;

e. participated in a full-day mediation and engaged in subsequent settlement discussions.

25.     Among the hurdles Plaintiff would face absent a settlement, two stand out as the most significant and pose the greatest risk to achieving any recovery.

a. First, Plaintiff's sole remaining claim—the Prestige Claim—rests on the allegation that EHang overstated the size of Prestige's pre-order. During mediation, Plaintiff was presented with evidence suggesting that overcoming a motion for summary judgment would be difficult. Based on Plaintiff's evaluation of this evidence, there was a substantial risk that, after incurring considerable expense conducting cross-border discovery, Plaintiff could ultimately lose at summary judgment.

b. Second, because only the Prestige Claim remains, recovering the maximum classwide damages of $23 million, as calculated by Plaintiff's expert, would require proving that the *entire* decline in EHang's ADS price following the Hindenburg Report was attributable solely to allegations regarding the 100-unit Prestige pre-order. However, the Hindenburg Report included numerous other fraud allegations, such as the non-existence of a *1,000-unit* United pre-order.

8

> Common sense suggests that the price decline could not reasonably be attributed exclusively to the Prestige Claim. Indeed, Defendants' expert would likely argue persuasively that the Prestige Claim accounted for only a small fraction of the stock decline, meaning actual damages would be only a fraction of the $23 million.

26.    Moreover, Lead Counsel are experienced securities class action practitioners and have litigated numerous actions against Chinese issuers. Exhibit 3 (firm resume); s*ee e.g., Christine Asia Co. v. Yun Ma*, 2019 WL 5257534, at *19 (S.D.N.Y. Oct. 16, 2019) (achieving $250 million settlement against Alibaba, with the Court stating that "[t]he quality of representation by [Rosen] and Defendants' counsel was high in this case . . ."); *De Schutter v. Tarena International, Inc., et al*., Case No. 1:21-cv-03502 (E.D.N.Y.).

27.    As such, they are acutely aware of the practical risks inherent in this litigation, including the challenges posed by Defendants and key sources of proof being located in China, as well as concerns regarding the collectability of any settlement or judgment from Chinese Defendants. Plaintiff and Lead Counsel carefully considered these risks in deciding to enter into the Settlement.

28.    As Defendants are based in China, discovery, which is already complex, timely, and costly, would pose additional obstacles. China does not permit depositions on the mainland or virtual depositions which would require the cooperation of Defendants and witnesses to travel out of China for depositions. Additionally, China-based defendants, including Defendants here, have asserted that the export of documentary evidence is subject to certain Chinese law governing the export of data abroad. Lead Counsel has been, and is currently, involved in litigation with China-based defendants in which discovery has been significantly stalled by this process. Additionally, any documents that were eventually produced will likely be in Chinese

which would require translation or the retention of bilingual attorneys to facilitate document review.

29.     Even if Plaintiffs succeeded in getting discovery and obtaining a favorable judgment at trial, it may be a pyrrhic victory. Enforcing a U.S. judgment in China is nearly impossible as the U.S. Department of State has noted that "[t]here is no bilateral treaty or multilateral convention in force between the United States and any other country on reciprocal recognition and enforcement of judgments."[4] Although the international community is attempting to create consistency in reciprocity among foreign counties, progress between the United States and China has not occurred. Although not yet in effect, the 2019 Hague Convention on the Recognition and Enforcement of Foreign Judgments in Civil or Commercial Matters ("Hague Judgment Convention"),[5] is designed to facilitate the enforceability of judgments among contracting parties. The Hague Judgment Convention's stated goal is "to promote effective access to justice for all and to facilitate rule-based multilateral trade and investment, and mobility, through judicial co-operation." *Id*. Even if it were operative, the Hague Judgment Convention would not be helpful here as the United States is a signatory but China is not. *Id*.

30.     Moreover, China regularly denies recognition and enforcement of foreign judgments, including from the United States, based on reciprocity or public policy. Shun-Hsiang Chen, *Signed, Sealed, & Undelivered: Unsuccessful Attempts of Foreign Judgment Recognition Between the U.S. and China*, 16 Brook. J. Corp. Fin. & Com. L. 167 (2022). As China does not have an agreement with the United States, enforcement of United States judgments would fall within the parameters of reciprocity. However, "China's reciprocity system is considered one of the most restrictive in the world and

---

[4]    https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Enforcement-of-Judgements.html (last accessed February 14, 2025).

[5]  https://www.hcch.net/en/instruments/conventions/full-text/?cid=137  (last accessed December 11, 2025).

regularly utilized to deny foreign judgment recognition and enforcement." *Id.* at 184. As of June 2022, Chinese courts had only recognized and enforced two judgments from the United States, *id.*, neither of which were judgments from securities lawsuits.

31. Further, although Defendants retained counsel based in the United States, the risk remains that Defendants could disengage with its counsel and this litigation. Lead Counsel experienced this first-hand in *Vanderhoef v. China Auto Logistics, Inc.*, No. 2:18-cv-10174-CCC-ESK (D.N.J.), involving China Auto Logistics, Inc. ("CALI"), a Nevada corporation with headquarters in China and China-based individual defendants. Originally, CALI was represented by K&L Gates LLP and the China-based individual defendants had their own counsel. Prior to a decision on CALI's motion to dismiss, plaintiffs and CALI engaged in court-ordered mediation over two days. As settlement efforts were unsuccessful, CALI's motion was reinstated. The court then denied CALI's and the China-based individual defendants' motions to dismiss. Before CALI's deadline to file an answer, its counsel requested to withdraw from the action as CALI had not paid its attorneys for almost a year. The China-based individual defendants filed an answer, but soon after their attorneys also withdrew as those defendants stopped engaging meaningfully with their counsel and failed to pay their attorneys. In the end, the plaintiffs were forced to voluntarily dismiss their claims against CALI and the China-based individual defendants without prejudice as they did not retain new counsel and ultimately vanished. *See* Exhibit 5 (letter from plaintiffs outlining history of events and grounds for dismissal).

32. Similarly, in *In re ChinaCast Education Corporation Securities Litigation*, 2:12cv-04621-JFW-PLA (C.D.Cal.), for about six years plaintiffs diligently pursued a securities class action against ChinaCast Education Corporation, a Delaware company operating in China. The effort included a successful appeal at the Ninth Circuit which reversed the district court's dismissal decision. ChinaCast's insurers refused to cover litigation costs, however, and the company's counsel withdrew from the action leaving ChinaCast unrepresented. The plaintiffs later secured a default

judgment of $65.8 million for the class, but the very next day, ChinaCast filed for bankruptcy. In an attempt to recover the default judgment, plaintiffs spent an additional two years pursuing a lawsuit against ChinaCast's multiple insurers. *See Jayhawk Private Equity Fund II LP v. Liberty Insurance Underwriters*, 2:17-cv-05523-GW-RAO (C.D.Cal.). Unfortunately, plaintiffs' claims were dismissed due to the expansive exclusion provisions in the insurance policies. Therefore, despite more than seven years of dedicated efforts by the plaintiffs' counsel, there was no financial recovery for the investors from the China-based defendant.

33.  Plaintiff's decision to enter into the Settlement reflects a careful evaluation of the merits of the remaining claim as well as the practical challenges inherent in litigating against China-based defendants.

### The Attorneys' Fees and Expenses Requested are Fair and Reasonable

34.  Lead Counsel requests attorneys' fees of 25% of the Settlement Amount, or $496,250, plus interests, and reimbursement of out-of-pocket litigation expenses of $57,048.70 in total, plus interest.

35.  In the Notice, Plaintiff informed potential Settlement Class Members that Lead Counsel intended to seek an award up to 25% of the Settlement Fund and up to $67,000 in litigation expenses. Bravata Decl., Ex. A (Long Notice) at 1, 8; Ex. C (Postcard Notice), Ex. D (Summary Notice).  Accordingly, the expenses being sought are significantly less than what is stated in the Notice.

36.  From the very beginning, Lead Counsel undertook a challenging, costly, and potentially protracted litigation on behalf of the Settlement Class, without any assurance of being compensated for the substantial time and resources invested. In assuming this responsibility, Lead Counsel committed to allocating adequate resources to the Action, ensuring the availability of funds to compensate staff and cover all necessary expenses.

37.     As detailed in the chart below, my firm to date has performed 444.21 professional work hours for a lodestar amount of $481,352.75. The $496,250 in attorneys' fees that Lead Counsel requests represent a lodestar multiplier of 1.03.

| Professional (Position)* | Hourly Rate | Hours Worked | Lodestar |
|---|---|---|---|
| Phillip Kim (P) | $1,400 | 12.5 | $17,500.00 |
| Jonathan Horne (P) | $1,200 | 38.9 | $46,680.00 |
| Yu Shi (P) | $1,100 | 337.6 | $371,360.00 |
| Jing Chen (P) | $1,100 | 29.4 | $32,340.00 |
| Erica Stone (C) | $975 | 0.7 | $682.50 |
| Scott Kim (A) | $675 | 0.6 | $405.00 |
| Ryan Hedrick (A) | $625 | 1.75 | $1,093.75 |
| Christie Buzzetti (A) | $550 | 0.3 | $165.00 |
| Ian McDowell (A) | $550 | 7.93 | $4,361.50 |
| Eric Bi (A) | $500 | 12.53 | $6,265.00 |
| Julia Shimizu (Pl) | $250 | 2.0 | $500.00 |
| **Total** | | **444.21** | **$481,352.75** |

\* Partner (P), Counsel (C), Associate (A), Paralegal (Pl)

38.     The hourly rates reflect current billing rates for 2025 and were prepared from contemporaneous time records regularly prepared and maintained by my firm.[6]

---

[6] Courts routinely consider current billing rates when evaluating attorney time as "[a]ttorneys in common fund cases must be compensated for any delay in payment[.]" *Stanger v. China Elec. Motor, Inc.,* 812 F.3d 734, 740 (9th Cir. 2016). To account for the delay in payment, "(1) the court may apply the attorneys' current rates to all hours billed during the course of the litigation; or (2) the court may use the attorneys' historical rates and add a prime rate enhancement." *Id.* Courts in this Circuit and around the country routinely apply current rates when performing a lodestar analysis, the Court should follow suit. *Purple Mountain Tr. v. Wells Fargo & Co.*, 2023 WL 11872699, at *5 (N.D. Cal. Sept. 26, 2023) (noting its use of "current rates" for lodestar); *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1119 n.6 (C.D. Cal. 2012) ("[F]or the fee award to be reasonable, it must be based on current, rather than historic, hourly rates") *citing Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *In re Hi-Crush Partners L.P. Sec.*

39.     Rosen's rates are comparable to peer securities class action and complex litigation practitioners.[7] *See* Exhibit 6 (chart of peer plaintiff and defense law firm billing rates). In fact, Lead Counsel's rates are substantially *less* than rates charged by the firm representing Defendants in this Action, Cooley LLP, in two recent bankruptcy cases where partners were billed at rates as high as $1,895 per hour, associates at rates as high as $1,500 per hour, and support staff at rates as high as $605 per hour. *See id.* at p. 6.

40.     Courts in this District have previously awarded attorneys' fees to Rosen based on substantially the same rates presented here. *See e.g., In re FAT Brands, Inc. Sec. Litig.*, Case No. 2:22-cv-1820-MCS-RAO (C.D. Cal.), ECF No. 67-2 (declaration setting forth 2023 hourly rates for Rosen attorneys) and 71 (order awarding attorneys' fees); *Oh v. Hanmi Fin. Corp.,* Case No. 2:20-cv-2844-FLA-JCx (C.D. Cal.), ECF No.

---

*Litig.*, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014) ("The use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation").

[7] *See Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172 (C.D. Cal. 2010) ("Courts may find hourly rates reasonable based on evidence of other courts approving similar rates or other attorneys engaged in similar litigation charging similar rates."). Rosen's hourly rates for attorneys who worked on this case are consistent with those of other attorneys engaged in similar litigation in this Circuit and throughout the country. *See, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,* 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (approving fee award with "billing rates ranging from $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals"); *Fleming v. Impax Lab'ys Inc.,* 2022 WL 2789496, at *9 (N.D. Cal. July 15, 2022) (approving hourly rates of $760 to $1,325 for partners, $895 to $1,150 for counsel, and $175 to $520 for associates, finding these "billing rates in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation"); *Hope Med. Enters., Inc. v. Fagrgon Compounding Serv., LLC*, 2022 WL 826903, at *3 (C.D. Cal. Mar. 14, 2022) (finding "rates of $895 to $1,295 per hour for partners and counsel, and between $565 and $985 for associates" to be reasonable).

94-4 (declaration setting forth 2024 hourly rates for Rosen attorneys) and 98 (order awarding attorneys' fees); *Donley v. Live Nation Entertainment Inc.,* Case No. 2:23-cv-06343-KK-AS (C.D. Cal.), ECF No. 95-4 (declaration setting forth 2025 hourly rates for Rosen attorneys) and 101 (order awarding attorneys' fees). As is common in the legal marketplace, the billing rates for Rosen professionals increase each year.[8]

41.    Additionally, Rosen expended a total of $57,048.70 in un-reimbursed expenses in connection with the prosecution of the Action as follows:

**LIST OF UNREIMBURSED EXPENSES**

| Category | Amount |
|---|---|
| Financial Expert (damages and loss causation) Fees | $8,633.00 |
| Investigator Fees | $9,000.00 |
| Online Computer Legal Research and Document Retrieval Fees | $495.96 |
| Court Filing Fees | $405.00 |
| *Pro Hac Vice* Fees | $500.00 |
| Mediation Fees | $15,500.00 |
| Courier (FedEx) Fees | $68.65 |
| Service of Process Fees | $630.46 |
| Translation Fees | $1,031.79 |
| Notice to Class Members Fees/Press Releases | $14,256.00 |
| Travel, Hotels, Transportation, and Meals* | $6,527.84 |
| **TOTAL EXPENSES** | **$57,048.70** |

*Includes anticipated expenses associated with attending the January 9, 2026 Settlement Hearing.

42.    The expenses set forth above are reflected in Lead Counsel's books and records. These books and records are prepared from expense vouchers, check records, and financial statements prepared in the normal course of business for my firm and are an accurate record of the expenses incurred in the prosecution of the Action.

---

[8] *Parker v. Vulcan Materials Co. Long Term Disability Plan*, 2012 WL 843623, at *7 (C.D. Cal. Feb. 16, 2012) ("It is common practice for attorneys to periodically increase their rates for various reasons, such as to account for expertise gained over time, or to keep up with the increasing cost of maintaining a practice.").

43.     To date, Lead Counsel have received neither compensation for their efforts nor reimbursement of necessary out-of-pocket expenses on behalf of Plaintiff and the Settlement Class.

44.     The expenses Lead Counsel incurred in the chart above were reasonable and necessary for the successful prosecution of this case.

45.     In light of the complex nature of securities class action litigation and the difficulties in pleading and proving liability, as well as proving loss causation and damages at trial, the litigation expenses incurred were reasonable and necessary to pursue the interests of the Settlement Class.

46.     Lead Counsel's work will not end with final approval of the Settlement. Lead Counsel will spend more time and resources drafting and filing replies in support of its motions for final approval and for attorneys' fees, preparing for and appearing at the Settlement Hearing, overseeing the claims process, filing a motion for distribution of the Net Settlement Fund, and overseeing the distribution of the Net Settlement Fund to eligible Settlement Class Members. Lead Counsel will not seek additional compensation for these tasks.

**The Requested Award to Plaintiff is Justified**

47.     Plaintiff has devoted time and effort leading this Action on behalf of the Settlement Class.  He now seeks an award to compensate him for this time and effort pursuant to the PSLRA.

48.     As set forth in his declaration, Plaintiff's active involvement in this Action included:

    a.  Reviewing the initial complaint filed in this Action;

    b.  Researching law firms to potentially serve as lead counsel;

    c.  Discussing with Lead Counsel the possibility of serving as Lead Plaintiff and the responsibilities associated with that role;

    d.  Gathering and providing documents for Lead Counsel;

e. Reviewing the amended complaint and other major filings;

f. Reviewing updates from, and communicating with, Lead Counsel concerning significant case developments;

g. Consulting with Lead Counsel about the mediation, including assessing the strengths and weaknesses of the case;

h. Evaluating and approved the Settlement.

Exhibit 2, Zhang Decl., ¶4.

49. For this time and effort, Plaintiff respectfully requests an award of $2,500.

50. The requested Award to Plaintiff is 0.1% of the Settlement Amount.

51. At this time, Plaintiff cannot compare the requested Award to the average individual payment to Settlement Class Member because the claim submission deadline does not expire until December 19, 2025. In Plaintiff's reply, to be filed on or before December 26, 2025, Plaintiff will include a declaration from the Claims Administrator providing a preliminary count of valid claims received. With that information, Plaintiff will be able to estimate the average payment per Settlement Class Member who submitted a valid claim and compare it to the requested $2,500 Award.

## Claims Administration Costs

52. In its Preliminary Approval Order, the Court directed Plaintiff to include, with or as part of the motion for final approval, information regarding the Claims Administrator's proposed fees and the components of 'reasonable and necessary administrative costs.' Accordingly, Plaintiff submits herewith the Declaration of Paul Mulholland of SCS, which explains the services the Claims Administrator will provide and the estimated associated costs. *See* Exhibit 7.

53. Claims administration fees and related administrative expenses are standard and necessary components of securities class action settlements. A claims administrator performs essential tasks such as disseminating notice, processing claims and documentation, verifying eligibility, calculating individual payments, and ensuring

accurate distribution of settlement funds. These costs are not ancillary; they are integral to the proper execution of the settlement, and are routinely approved by courts.[9] Accordingly, Plaintiff respectfully submits with the final approval motion a proposed order authorizing payment of Administrative Costs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 12, 2025

/s/ Yu Shi
Yu Shi

---

[9] *See e.g., In re FAT Brands, Inc. Sec. Litig.*, Case No. 2:22-cv-1820-MCS-RAO (C.D. Cal.), ECF No. 61 at ¶12 ("The Escrow Agent may, at any time after entry of this Order and without further approval from Defendants or the Court, disburse at the direction of Class Counsel up to $150,000 from the Settlement Fund prior to the Effective Date to pay reasonable Administrative Costs. After the Effective Date, up to an additional $100,000 may be transferred from the Settlement Fund to pay for any reasonable and necessary Administrative Costs without further order of the Court.").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of December, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/ Yu Shi</u>
Yu Shi

19